1   Tyler M. Paetkau (Bar No. 146305)
    E-mail:tyler.paetkau@procopio.com
2   Alyssa Aiko Yamakawa (Bar No. 234853)
    E-mail:aiko.yamakawa@procopio.com
3   PROCOPIO, CORY, HARGREAVES & SAVITCH LLP
    1117 S. California Avenue, Suite 200
4   Palo Alto, CA  94304
    Telephone: 650.645.9000
5
6   Attorneys for Plaintiffs
    Scott Powell and John Mills
7

8                    UNITED STATES DISTRICT COURT

9              FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11

12   SCOTT L. POWELL and JOHN S. MILLS,          Case No. _____

13                Plaintiffs,                     **COMPLAINT FOR DAMAGES
                                                  (SECURITIES FRAUD AND BREACH
14   v.                                           OF CONTRACT)**

15   NEPHOSCALE, INC. and BRUCE TEMPLETON,        **JURY TRIAL REQUESTED**

16                Defendants.

17

18        Plaintiffs SCOTT POWELL and JOHN MILLS allege as follows:

19                      **I.      THE PARTIES**

20        1.     Plaintiff Scott Powell is, and at all times mentioned in this Complaint was, an

21   individual residing at 1301 46th Street, Sacramento, California 95822.

22        2.     Plaintiff John Mills is, and at all times mentioned in this Complaint was, an

23   individual residing at 185 Harcross Road, Woodside, California 94062.

24        3.     Upon information and belief, Defendant NephoScale, Inc., formerly known as

25   Silicon Valley Webhosting, Inc. ("NephoScale," "Silicon Web Hosting," or the "Company"), is,

26   and at all times relevant to this Complaint was, a corporation organized and existing under the laws

27   of California, with its principal place of business located at 95 S Market St. #648, San Jose, CA

28   95113.

4.     Upon information and belief, Defendant Bruce Templeton ("Defendant Templeton" or "Templeton") is, and at all times relevant to this Complaint was, an individual and co-founder of NephoScale, Chief Executive Officer and a member of the Board of Directors of NephoScale.

## II.     JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs' Claims for Relief arise under the laws of the United States.

6.     Venue is proper in the United States District Court for the Northern District of California pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the events and omissions giving rise to the claims alleged herein occurred in this district.   Additionally, the Promissory Notes, as further described below, attached as Exhibits A, B, E and F and incorporated by reference, state at Section 18,

> All disputes and controversies arising out of or in connection with this Note shall be resolved exclusively by the state and federal courts located in Santa Clara County in the State of California, and each of the Company and Investor hereby agrees to submit to the jurisdiction of said courts and agrees that venue shall lie exclusively with such courts.

## III.     FACTUAL BACKGROUND

7.     On or about December 20, 2013, Defendant Templeton telephoned Mr. Mills and asked him for an emergency bridge loan of $40,000.  Defendant Templeton told Mr. Mills that without an immediate injection of capital he would miss payroll for his employees.  Defendant Templeton further told Mr. Mills that he was tired and burned out from running Silicon Valley Web Hosting, Inc., which corporation was later renamed NephoScale, Inc., and that, beginning in January 2014, he intended to launch a sales process to sell Silicon Valley Web Hosting to a third-party acquirer, and that the proceeds from the loan would be used to achieve a sale of Silicon Valley Web Hosting or its assets and repay the loan from Mr. Mills.

8.     During the December 20, 2013 telephone call and in various other telephone conversions between Mr. Mills and Defendant Templeton, Defendant Templeton also made

numerous representations to Mr. Mills that Silicon Valley Web Hosting was close to "break-even" and that Defendant Templeton had a number of pending customer deals in his pipeline that would take Silicon Valley Webhosting to break-even and beyond.

9.     During the December 20, 2013 telephone call and in several follow-up telephone calls from Defendant Templeton to Mr. Mills prior to December 26, 2013, Defendant Templeton made further representations to Mr. Mills that even if the pending customer deals fell through, he had the ability and a plan to trim expenses in order to get Silicon Valley Web Hosting to break-even, and that Silicon Valley Web Hosting's revenue generating assets and customers could be used to repay the loan within six months if a sale of the Company had not yet materialized and that Defendant Templeton had invested $4 million of his own money in the Company and that "over his dead body" would he lose $4 million, or words to that effect.

10.     Mr. Mills had no reason to doubt Defendant Templeton's representations, and in fact, Mr. Mills previously loaned Defendants $85,000, and Defendants paid that sum back to Mr. Mills.  In reasonable reliance upon Defendant Templeton's representations during the telephone conversations between December 20 through 26, 2013, Mr. Mills agreed to provide Defendants with an emergency bridge loan of $40,000 and funded such amount via wire transfer to the Silicon Valley Webhosting account on December 26, 2013.  The loan was evidenced by a promissory note signed by Defendant Templeton on behalf of Silicon Valley Webhosting, Inc., doing business as NephoScale, a true and correct copy of which is attached as Exhibit A and incorporated by reference ("Promissory Note").  Although Defendant Templeton presented a draft Note Purchase Agreement to Mr. Mills, Mr. Mills did not at the time and has never signed that agreement due to that fact that there remained unresolved terms between the Parties concerning the Promissory Note. On or about January 23, 2014, Silicon Valley Web Hosting, Inc. filed a Certificate of Amendment of Articles of Incorporation with the California Secretary of State reflecting the amended name of the corporation, "Nephoscale, Inc."

11.     In March 2014, Defendant Templeton telephoned Mr. Mills again and solicited additional loan proceeds from Mr. Mills using the same fraudulent sales pitch:  Defendant Templeton and his team wanted to sell the Company and needed additional bridge funding to give

them "runway" in order to complete a sales transaction and that, barring an imminent sale, Silicon Valley Web Hosting was on the verge of break-even status and the Company would be able to repay Mr. Mills either through a sale of Silicon Valley Webhosting or its assets, or with cash flow generated from operations achieved by new customer wins, expense reductions or some combination thereof.

12.    In reasonable reliance upon Defendant Templeton's oral representations in March 2014, Mr. Mills agreed to, and did, provide Defendants with an additional loan of $10,000.  The loan was evidenced by a promissory note signed by Defendant Templeton on behalf of NephoScale, a true and correct copy of which is attached as Exhibit B and incorporated by reference (also, a "Promissory Note" and collectively with Exhibit A, "Promissory Notes").

13.    Plaintiff Mills previously loaned Defendants $85,000, and Defendants paid that sum back to Plaintiff.  Particularly in light of this prior experience, Plaintiff Mills reasonably relied upon Defendant Templeton's representations and promises set forth in paragraphs 7 through 12, which were materially and intentionally false and misleading in agreeing to loan money at Defendants' request.

14.    On or about April 28, 2014, Defendant Templeton contacted Plaintiff Powell by email and phone to convince Mr. Powell to invest in promissory notes, representing to Mr. Powell that the Company had a number of pending customer deals that would bring in $50,000 or more in monthly recurring revenue, and thus bringing the Company into profitability without the need of spending additional capital:

> We are at a negative cash flow run rate of about minus $30K/mo.-
> $50K/mo. - depending upon the month. We had it down to about
> $15K/mo. just about a month ago, but lost another $25K in the IP
> address rental revenue since then to only put us back where we were.
> I do think we can get back to breakeven in the next couple of months
> by tapping several potential sources of revenue. We do have a
> growing sales pipeline in place, outside of our work with HDS.
> We are launching a new unique, and we think disruptive, SSD

1    Virtual/SSD Dedicated w/ 10 Gbps solution at the end of this month.

2    We call it ultra-performance Hybrid Compute. We think it will add

3    significantly to customer traction and additional revenue over the

4    remaining part of the year. There are several customers waiting for us

5    to launch it so they can use it. The money to develop this new

6    offering has already been spent on engineering and equipment, and

7    the equipment needed for the infrastructure footprint required to

8    launch has already been purchased. We have enough computing and

9    storage capacity in place now to add about $50k/month in revenue in

10    cloud services, without spending hardly a dime on equipment.

11  Attached as Exhibit C and incorporated by reference is a true and correct copy of the April 28,

12  2014 email from Defendant Templeton to Mr. Powell.

13        15.     On April 28, 2014, Defendant Templeton also represented to Mr. Powell in an email

14  that the noteholders would receive an exceptional return on their money in a short period of time:

15    I'm extremely confident we are going to be successful, and that we

16    are going to create an excellent return for our noteholders, and it will

17    likely happen in a short period of time based upon what we built and

18    what is happening in the market.

19  Exhibit C.

20        16.     Defendant Templeton further represented to Mr. Powell, orally in their telephone

21  conversations and in email, that this was the last time the Company would be offering convertible

22  notes at a $7 million valuation and would be raising money at $20 million to $30 million valuation

23  if the Company had not already been sold:

24    Hitachi goes without saying, it is a big opportunity for the company

25    in so many ways.  The revenue from the HDS alone will help with

26    grow NephoScale's revenue through added sales and marketing

27    investment and it will accelerate the development of our intellectual

28    property.  It will also attract investors that have been on the sideline.

> Once this $1M note is filled out we will not be selling any more of the company at a $7M valuation.  The valuation would be more like $20-30M if we did take in more money.

Exhibit C.

17.    Defendant Templeton also provided to Mr. Powell a term sheet dated April 25, 2014, a true and correct copy of which is attached as Exhibit D and incorporated by reference.

18.    Based on the Defendant Templeton's repeated representations and promises alleged above, Mr. Powell indicated to Defendant Templeton that he was willing to invest $50,000.

19.    On or about April 29, 2014, Defendant Templeton called Mr. Powell with the intent to induce Mr. Powell to invest more than $50,000.  To land additional investment dollars from Mr. Powell, Defendant Templeton sold Mr. Powell on that fact that NephoScale would be sold within six months, likely to Hitachi or a similar corporate buyer, and that he had invested $4 million of his own money in the Company and that Mr. Powell would reap a 3x return on his investment in a very short period of time, or words to that effect.  Based on these representations and promises from Defendant Templeton, Mr. Powell agreed to increase his investment amount from $50,000 to $100,000.  Attached as Exhibit E and incorporated by reference is a true and correct copy of the promissory note signed by Defendant Templeton on behalf of NephoScale evidencing the loan (also, a "Promissory Note" and collectively with Exhibits A and B, "Promissory Notes"),

20.    Having no reason to doubt Defendant Templeton's representations, Plaintiff Powell reasonably relied upon Defendant Templeton's representations and promises set forth in paragraphs 14 through 19 which were materially and intentionally false and misleading in making his investment decision regarding the Promissory Notes.

21.    On December 8, 2014, Mr. Mills made a final loan of $10,000 to Nephoscale to provide funds to achieve the sale of NephoScale as promised by Defendant Templeton. Attached as Exhibit F and incorporated by reference is a true and correct copy of the promissory note signed by Defendant Templeton on behalf of NephoScale (also, a "Promissory Note" and collectively with Exhibits A, B and E, "Promissory Notes").

22.    Upon information and belief, Defendant Templeton made little or no effort to sell

the Company as he had promised Plaintiffs, and was a primary basis for their investment decision. Rather, Defendant Templeton used the proceeds of the loans from Mr. Mills and Mr. Powell to continue paying his salary and pursuing his dream of transforming Silicon Valley Web Hosting from a hosting company into a venture-backed software licensing company called NephoScale, with the hope of attracting venture capital funding and pursuing an initial public offering (an "IPO").

23.     At the same time that Defendant Templeton was promising Mills and Powell "a quick exit with 3x returns," or words to that effect, he was telling other potential investors that he had no interest in pursuing an acquisition and wanted to go for venture capital funding and an IPO. Following an investor meeting between Defendant Templeton and Timothy Dick, a partner at Startup VC, on or about May 9, 2014, Mr. Dick reported the following: "Bruce is focused on an IPO and not seeking an acquisition even if attractive (we pushed him on this quite hard, he really wants that experience.)"

24.      Contrary to Defendant Templeton's representations to Plaintiffs that he was burned out and ready to sell Silicon Valley Webhosting, once he had secured funding through Plaintiffs, as evidenced by the Promissory Notes, and others, he began transforming Silicon Valley Web Hosting, a service provider on the verge of being cash-flow positive, into NephoScale, a software development company burning cash at a furious rate.

25.     On information and belief, Defendant Templeton had a practice of telling investors that he had invested $4 million of his "own money" in Silicon Valley Web Hosting and that any investment was a safe investment because he would never allow for a loss of his own funds and the investors would be paid before he received any payout.  In fact, Defendant Templeton made that representation to Mr. Mills in their telephone call in December 2013 as part of Defendant Templeton's sales pitch to induce Mr. Mills to invest in the Company and in a separate e-mail to investor Dennis Meinyer dated September 29, 2015.  Defendant Templeton wrote in his September 29, 2015 e-mail to Mr. Meinyer to induce him to invest and loan money to Defendant NephoScale:

> Please remember that I have $4M of my money into this company, so
> we are truly in this together, and over my dead body am I going to

lose my money.  Also, leasing companies and investors have preference over me in that if we sell for only $5M the leasing financing companies and investors get their money first, and our employees and me get whatever is left over.  As an investor you are in a safer place than I am in when it comes to the payout pecking order.

Attached as Exhibit G and incorporated by reference is a true and correct copy of the September 29, 2015 email from Defendant Templeton to Mr. Meinyer.

26.    On information and belief, Defendant Templeton had in fact not invested $4 million of his own cash in the Company but only had invested about approximately $1 million.  During July 2015, Mr. Mills assisted Defendant Templeton with revisions to the Company's strategic pitch deck via conference calls.  Mr. Mills wanted to include Defendant Templeton's oft-quoted statement that Defendant Templeton had invested $4 million in the business, but Defendant Templeton deleted it, finally confessing to Mr. Mills that he had only invested about $1 million, and was counting money earned by the Company over the years that was used for operating the business.  Attached as Exhibit H and incorporated by reference is a true and correct copy of an excerpt from the NephoScale sales pitch deck stating in writing that the NephoScale founder only invested $1.25 million.

27.    Upon information and belief, at the time of the loans made by Plaintiffs, Silicon Valley Web Hosting was a service provider, providing shared webhosting, dedicated servers, cloud hosting and leasing Company Internet Protocol version 4 ("IPv4") address space to customers through its data center operations in San Jose (collectively, the "Web Hosting Business").  Upon information and belief, the hosting customers, physical assets and financial attributes of the Web Hosting Business were the primary source of revenue and profits for Silicon Valley Web Hosting and the sole basis for Plaintiffs' investment, along with the understanding that the proceeds from the Promissory Notes were to be used to achieve a sale of the Company or its assets.

28.    Upon information and belief, by early 2015, NephoScale was losing more than $60,000 per month.

29.    In the Fall of 2015, Templeton continued to inform Messrs. Mills and Powell as well as other investors that a profitable sale of Nephoscale "returning a minimum of a 3x return to investors" was imminent.  In an email update on October 8, 2015, Templeton wrote to investors the following:

> "There is some good news and some bad news.  The bad news is that we just had Hitachi delay a $200k PO until December.  We need to raise at least $200k to get through the rest of the year."

> "The good news is that there is sufficient acquisition interest from numerous companies that it is time to run an M&A process with an investment banker.  We think the company can be sold quickly, and that we can return a minimum of 3x return to investors within 3 to 6 months.  The investment banker has done extensive due diligence on us and they also think we can be sold quickly.  We will take any reasonable offer to accelerate the process, we are not going to be greedy and we have no VCs involved on our board to force us in that direction."

Attached as Exhibit I and incorporated by reference is a true and correct copy of Defendant Templeton's email to Mr. Mills dated October 8, 2015.

30.    Upon information and belief, in the first half of 2015, when Defendant Templeton could no longer raise additional capital from new outside investors or from any of the Company's existing investors, he began secretly liquidating the Web Hosting Business in order to pay operating and payroll expenses for their software development efforts.  Upon information and belief, the liquidation of the Web Hosting Business assets began with the sale of Company IPv4 address space and shared hosting customers in a series of transactions starting in the first half of 2015 for approximately $200,000, and culminating in October 2015, when Defendant Templeton sold all of the Company's dedicated hosting customers and hardware, its most valuable revenue generating assets, for $565,000 to Denetron, LLC, a company owned by Daniel Ballenger, a NephoScale employee at the time, in an insider, fire sale transaction at a time when NephoScale was effectively insolvent (the "Denetron Sale").

31.    Upon information and belief, rather than repaying Mr. Mills and Mr. Powell with

the proceeds from these assets in accordance with terms of the Promissory Notes (and which assets were the basis of the investment decision by Mr. Mills and Mr. Powell), Defendant Templeton used such proceeds to continue paying his salary and for his personal benefit at the expense and detriment of Plaintiffs as creditors of NephoScale despite the fact that the Promissory Notes were due.

32.   Upon learning of the Denetron sale, Mr. Mills and Mr. Powell demanded full repayment pursuant to the terms of the Promissory Notes.  In an email dated October 21, 2015, Mr. Mills stated:

> I want you to repay me and [Mr. Powell] from the proceeds of the sale of the hosting business.  We did a bridge to help get you to an exit, and at the time of our investment you were just about a break-even, and with hosting assets, servers, IPs, etc. I was supportive of selling the IPs because I didn't believe that you would get separate value for those in an M&A.  But this is different in that you can't sell off a big chunk of your assets and not pay us back.  We were pretty clear that we were not "equity" investors and that is why we took out the conversion feature from our notes.

Attached as Exhibit J and incorporated by reference is a true and correct copy of the email from Mr. Mills to Defendant Templeton dated October 21, 2015.

33.   On October 21, 2015, Defendant Templeton responded to Mr. Mills that he would repay the Promissory Notes and the 3x return:

> Hey John, I hear you, and I want to get your money back asap and will do whatever I can to do this.  Can we talk about this before you speak with Scott?  In theory, we have until the expiration date on Dec. 23rd to finalize things, but will get your cash back asap if at all possible.  I confirmed that both you and Scott do have in your promissory notes the right to 3x return (with rights to participate above 3x in case of a sale over $21M) upon acquisition.

1  Exhibit J.

2      34.    In an email dated November 11, 2015, from Defendant Templeton to Mr. Powell,

3  Mr. Templeton stated,

4          John has told me that you and he want your money taken out of the

5          investment.  I assure you I'm doing everything I can to make that

6          happen asap.  There are legal issues with this as it relates to the other

7          noteholders, but the good news is that we do have a couple legal

8          opinions available to make this happen.

9      35.    In an email dated March 31, 2016, Mr. Powell again demanded repayment of the

10  notes.  Defendant Templeton responded as follows:

11          Hi Scott, I will be sending out an update letter to investors soon.  We

12          should be able to pay you and [Mr. Mills] off soon.  I've got a couple

13          of different potential avenues to get this done.  We have more big

14          news coming soon.  We feel the train has left the station and we

15          expect to double our topline revenue this year over last.  will be in

16          touch very soon on the pay-back.

17  Attached as Exhibit K and incorporated by reference is a true and correct copy of the email from

18  Defendant Templeton to Mr. Powell dated March 31, 2016.

19      36.    On or about August 18, 2016, both Mr. Mills and Mr. Powell called Defendant

20  Templeton and demanded payment of the Promissory Notes.  Defendant Templeton assured Mr.

21  Mills and Mr. Powell that he would repay the Promissory Notes and represented that he was

22  working with several investors to do so.  On August 19, 2016, Defendant Templeton sent an email

23  to Mr. Powell, with a carbon copy to Mr. Mills, stating:

24          Hi Scott, I just spoke with John on the phone.  We secured some

25          more funding, using the open convertible note we have still open, to

26          get us through the end of the year and even likely to profitability.

27          We are closing more and more software deals and the sales pipeline

28          is quite active with several engagements, so things are definitely

---

1
2
3
4
5
6
7

> looking up.  We are working with a few parties interested in funding
> an intuitional round of funding over the next couple of months, and
> at that time we will be converting all note holders to preferred shares
> at the $7M valuation.  You and John are the only investors that have
> communicated a desire to cash out their principal and accumulated
> interest.  It should be no problem to convince investors to pay you
> both off.  I will keep you posted.

8   Attached as Exhibit L and incorporated by reference is a true and correct copy of the email sent by

9   Defendant Templeton to Mr. Powell dated August 19, 2016.

10       37.     In an email dated August 25, 2016, from Mr. Powell to Mr. Templeton, Mr. Powell

11   stated in pertinent part:

12
13
14
15

> I would like to cash out the principle.  Due to the length of time on
> the bridge loan and the way the company has materially changed
> from from [sic] our original deal I am not interested in continuing
> down this path, it is time to move on.

16   Attached as Exhibit M and incorporated by reference is a true and correct copy of the email sent by

17   Mr. Powell to Defendant Templeton dated August 25, 2016.

18       38.     In September 2016, Defendant Templeton spoke to Mr. Powell over the telephone

19   and assumed him that the note would be paid off very soon.

20       39.     In November 2016, Mr. Powell called Defendant Templeton and demanded

21   payment on the note.  Defendant Templeton assured Mr. Powell that the Promissory Note would be

22   paid off by the end of the year.

23       40.     In an email dated February 28, 2017, from Mr. Powell to Defendant Templeton,

24   with a carbon copy to Mr. Mills, Mr. Powell stated,

25
26
27
28

> Bruce,
> You have been in default on this note for well over a year.  When we
> last talked in November, you stated that you had every attention of
> getting me paid off by the end of the year (2016).  I never heard from

you.

I am sick of being lied to, what do we have to do to get this cleaned
up?

41.     In an email dated March 2, 2017, from Defendant Templeton to Mr. Powell,
Defendant Templeton stated in pertinent part,

> The note is not in default, we have signed signatures from an
> aggregate majority of investors in the convertible note authorizing
> the extensions.  The group of investors in the note votes and the
> majority result applies to all investors in the note.  The only way I
> can get you out is to get someone to assume your note, and that is
> because we are not allowed to buy out one investor without offering
> to buy everyone else out to [sic].  Everyone in the group has to be
> treated equally.
>
> …
>
> Our team is committed to seeing this through and we will get you out
> as soon as we can do so without jeopardizing the company.
>
> The good news is that we are closer than ever before to making this
> happen for your, but I cannot promise a date.  I'm hoping we have
> some good news for you very soon.
>
> …

Attached as Exhibit N and incorporated by reference is a true and correct copy of the email sent by
Defendant Templeton to Mr. Powell dated March 2, 2017.  Mr. Powell forwarded the March 2,
2017 email from Defendant Templeton to Mr. Mills on March 3, 2017.

42.     In reliance on Defendant Templeton's repeated false representations as alleged
above, to wit: (1) sell NephoScale, (2) close imminent customer deals and reduce operating
expenses to achieve break-even financial status for the Web Hosting Business, (3) the fact that
Defendant Templeton had invested $4 million of his own person money into NephoScale and that

Plaintiffs Mills and Powell, as holders of Promissory Notes, would be paid in priority over Defendant Templeton and the employee stockholders, and (4) that the proceeds of the loans would be used for expenses related to selling NephoScale, Plaintiffs loaned Defendant NephoScale a total of $160,000 in Promissory Notes plus interest.  To date, Defendants failed to pay Plaintiffs any loaned amounts or interest earned.

## FIRST CLAIM FOR RELIEF

## SECURITIES FRAUD - VIOLATION OF SECTION 10(b) OF THE SECURITIES AND EXCHANGE ACT AND RULE 10b-5

### (Against All Defendants)

43.     Mr. Mills and Mr. Powell re-allege and incorporate herein by reference the allegations in paragraphs 1 through 42, inclusive, above, as though fully set forth herein.

44.     Section 2(a)(1) of the Securities Act of 1933, as amended (the "Securities Act"), defines a "security" as follows: "The term ''security'' means any note, stock, treasury stock, security future, security-based swap, bond, debenture, evidence of indebtedness…."

45.     The Promissory Notes purchased by the Plaintiffs were unregistered securities sold by the Defendants in reliance on an exemption from registration under the Securities Act.

46.     Each of the Promissory Notes offered by Defendants and purchased by Plaintiff also contained the following legend:

> This Note and the securities issuable upon the conversion thereof have not been registered under the Securities Act of 1933, as amended or the securities laws of any state.  They may not be sold, offered for sale, pledged or hypothecated in the absence of an effective registration statement or laws or an opinion of counsel or other evidence reasonable satisfactory to the corporation that such registration is not required.

See attached Exhibits A, B, E and F.

47.     As alleged in Paragraphs 7 through 42 above, Defendant Templeton knowingly and intentionally made repeated false representations in connection with the sale of the Promissory to

1   Plaintiffs.  This is a classic "bait and switch" story.  Defendant Templeton has spent years trying to

2   land funding from professional venture capital funds with zero success.  In desperate need of cash,

3   and with no venture capital funds willing to invest in the Company based on the merits of the

4   Company's assets or business model, they turned to "friends and family" with a disingenuous and

5   misleading story about quickly repaying investors from the sale of the Company.  This story is

6   documented in many emails from Defendant Templeton and his countless investor "pitches."  In an

7   email from Defendant Templeton to Mr. Mills dated October 9, 2015, Defendant Templeton

8   recounted this technique as working to gain traction with potential investors:

9             I've used this with some success over the past few days. "With

10            NephoScale there is an opportunity to get a 3x return with 7%

11            interest in 6 months or less. The company has mature proven

12            technology and is positioned well for an acquisition. After 5 years of

13            development work the company and the team are ready for an

14            acquisition. The company is looking to raise a bridge round of

15            approx. $500k to complete the M&A process.

16   Attached as Exhibit O and incorporated by reference is a true and correct copy of Defendant

17   Templeton's email to Mr. Mills dated October 9, 2015.  Defendant Templeton's representations in

18   connection with his offer and sale of the Promissory Notes to Mr. Mills and Mr. Powell as alleged

19   herein were intentionally, recklessly or negligently false and misleading.  Defendant Templeton's

20   false and misleading statements include, without limitation:

21            (1) The proceeds of the loans would be used to sell the Company,

22            that and loans would be repaid within 6-12 months and Plaintiffs

23            would earn a 3x return on their capital investment from the sale of

24            the Company;

25            (2) close imminent customer deals and reduced operating expenses to

26            achieve break-even financial status for the Web Hosting Business;

27            and

28            (3) the fact that Defendant Templeton had invested $4 million of his

own personal money into NephoScale.

48.     As alleged in Paragraphs 7 through 42 above, Defendant Templeton's misrepresentation were material and Mr. Mills and Mr. Powell considered important and actually and reasonably relied on Defendant Templeton's explanations as to how the Promissory Notes would be paid and the fact that he had invested $4 million of his own personal money into Nephoscale in making their decisions to purchase the Promissory Notes.

49.     As alleged in Paragraphs 22 through 31, Defendants knowingly intended to deceive, manipulate and defraud Plaintiffs in making the fraudulent representations.

50.     As alleged in Paragraph 42, Plaintiffs suffered actual damages in an amount to be proved at trial and at least in the principal amounts of the Promissory Notes plus interest as a result of Defendants fraudulent representations and failure to timely pay the Promissory Notes.

51.     The statute of limitations period for this securities fraud claim did not begin to run until the Plaintiffs discovered the facts constituting the violation, including the Defendants' fraudulent intent.  It took Plaintiffs Mills and Powell additional time to appreciate Defendants' fraudulent intent in light of Defendants' continued assurances that the Promissory Notes would be paid off, as alleged in Paragraphs 29 through 41, above.  Consequently, the statute of limitations did not begin to run until at least the beginning of March, 2017.  Up until that time, Defendants repeatedly assured Plaintiffs that they would pay the Promissory Notes.

52.     Plaintiffs are entitled to their reasonable attorneys' fees and costs, incurred in connection with this action, pursuant to Section 16 of the Promissory Notes which states:

> If action is instituted to collect this Note, the Company agrees to pay all costs and expenses, including without limitation, the Investor's reasonable attorneys' fees and costs, incurred in connection with such action.  The Company hereby waives notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor and all other notices or demands relative to this instrument.

**SECOND CLAIM FOR RELIEF**

**BREACH OF CONTRACT**

**(Against All Defendants)**

53.     Mr. Mills and Mr. Powell re-allege and incorporate by reference the allegations in Paragraphs 1 through 52, inclusive, above, as though fully set forth herein.

54.     Defendants duly made, executed and delivered to Plaintiffs the Promissory Notes attached hereto as Exhibits A, B, E and F.

55.     In the Promissory Notes, Defendants expressly promised to pay to the order of Plaintiffs, the aggregate principal sum of $160,000, together with interest at the rate of 7% per annum, compounded annually.  In addition, Section 6(b) of the Promissory Notes provide for the payment of a premium in the event of a "Change of Control" as follows:

> (b) Payment Upon a Change of Control. If the Company shall have a Change of Control at any time while this Note remains outstanding the Company shall pay the Investor an amount equal to the sum of (i) the outstanding principal amount of the Note, plus (ii) an additional two times the outstanding principal on the Note at the time of the consummation of the Change of Control transaction, plus (iii) all accrued interest.

56.     A "Change of Control" includes a sale of all or substantially all of the assets of the Company.  The definition of "Change of Control" under Section 1(c) of the Promissory Notes, in pertinent part states as follows:  "(c) Change of Control" shall mean: … (ii) a sale, lease or other conveyance of all [or] substantially all of the assets of the Company."

57.     The sale of the Web Hosting Assets, including the Denetron Sale, constituted a Change of Control under Section 6(b) of the Promissory Notes.  It is well established under California and Delaware corporate law that the term "a sale of substantially all of the assets" occurs when the sale of assets accounting for more than 50% of the company's revenue generating assets has occurred.  Upon the occurrence of a Change of Control under the Promissory Notes due to the Denetron Sale, the Notes become automatically due and payable and the term of the Promissory

Notes cannot thereafter be extended.

58.     On November 1, 2015, the closing of the Denetron Sale, the Promissory Notes became immediately due and payable in following amount:

$160,000 in principal

$320,000 in change of control premium

$46,336, in accrued interest

Total due: $526,336

59.     In the alternative, in the event that the Court finds that a "sale of substantially all of the assets" triggering Change of Control did not occur, payment of the entire principal and accrued interest amount was due on the stated maturity dates in the Promissory Notes or as a result of an "Event of Default" under Section 4(d)(ii) of the Promissory Notes ("the Company shall be unable, or admit in writing its inability, to pay its debts generally as they mature.")  The Court need not determine whether the Promissory Notes were legally extended beyond the original maturity dates, as the Promissory Notes accelerated and became immediately due and payable upon the following events: (1) the liquidation of the Webhosting Assets outside the ordinary course of business as the only means of keeping the Company afloat, and (2) the Company was insolvent.

60.     Among other things, Defendant Templeton sent e-mails to NephoScale's investors, including Mr. Mills:

As far as our cash needs go, we are trying to get in about $200k on the convertible note (see attached terms sheet) by the end of Oct. to give us time for some of the other things from the pipeline to fall into place.  Our pipeline shows $200k coming from Hitachi, $200k from iService, and another $200k from Spirent - all in Q4.  The problem we face right now is the cash shortage we are facing between now and the middle of Nov. to the beginning of Dec…..  We are burning about $100k/mo. right now if we base the revenue projections solely upon what we get from recurring monthly revenue from the hosting side of the business.

Attached as Exhibit P and incorporated by reference is a true and correct copy of the email sent by Defendant Templeton to Mr. Mills.

61.     In October 2015, Defendant Templeton admitted to Mr. Mills that the Company had not paid its colocation and data center bills in months and was about to be locked out or shut off, and that Defendant Templeton had blocked the automatic debit to the IRS for the payment of the employer portion of payroll taxes or otherwise their account would be overdrawn.

62.     Section 5 of The Promissory Notes provide that "upon the occurrence or existence of any Event of Default described in Sections 4(d) or 4(e), immediately and without notice, all outstanding Obligations payable by the Company hereunder shall automatically become due and payable, without presentment, demand, protest or any other notice of any kinds, all of which are hereby expressly waived, notwithstanding anything to the contrary contained in any Transaction Document." Thus, the default and acceleration provisions of Section 4(d)(ii) and 4(e) cannot be cured and are exempt from any approvals, waivers or extensions by the holders of a Majority of the Notes.

63.     The sale of the Web Hosting business was made to an insider at below market, value, at a time when the Company was insolvent or inadequately capitalized.  The plain language of the Promissory Notes under the Change of Control provision and the Events of Default were intended to protect the Plaintiff Promissory Note holders from such situations.  As set forth in Paragraphs 21 through 25 above, each of which are incorporated by reference hereon, Defendant Templeton further deceived Plaintiffs by assuring them they would be repaid by the end of the year and that he had a number of interested parties willing to take over their Notes. None of these statements were true and Defendants continue to be in breach of their payment obligations under the Promissory Notes.

64.     "Insolvency" is generally defined with reference to a corporate entity, as a financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation.  The value of the Company's assets at that time was effectively zero as no third parties would invest money in NephoScale.  Under the UFTA, a debtor who is not generally paying its debts as they become due is presumed to be insolvent.

65.     Upon an Event of Default, the Promissory Notes provided for the acceleration of all unpaid outstanding principal and interest to be immediately due and payable.

66.     Upon default, the Promissory Notes provided for the payment of all reasonable out-of-pocket expenses of Plaintiffs (including reasonable fees of their counsel) in connection with the enforcement of any provision of the Promissory Notes or the collection of the Promissory Notes.

67.     Defendants have failed, and continue to fail, to pay the $160,000 in outstanding principal and accrued interest as required by the terms of the promissory note, though requested to do so.

68.     Plaintiffs have requested full repayment of the Promissory Notes on numerous occasions including notifying Defendant of the default under the Promissory Notes and demanded that Defendant make immediate repayment plan of all amounts due under the Promissory Notes. As of the date hereof, Plaintiffs have received no payments on the debt, nor any commitment to a repayment plan of the debt.

69.     Defendant's failure and refusal to pay has caused Plaintiffs at least $505,000 in damages.

70.     In the alternative, in the event that a Change of Control did not occur, payment of the entire principal and interest was due on December 26, 2016 (the "Extended Maturity Date").

71.     Plaintiffs are entitled to their reasonable attorneys' fees and costs, incurred in connection with this action, pursuant to Section 16 of the Promissory Notes which states:

> If action is instituted to collect this Note, the Company agrees to pay all costs and expenses, including without limitation, the Investor's reasonable attorneys' fees and costs, incurred in connection with such action.   The Company hereby waives notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor and all other notices or demands relative to this instrument.

1

### IV.    PRAYER FOR RELIEF

2      WHEREFORE, Plaintiffs demand judgment against Defendants for:

3      1.      Compensatory damages in an amount to be proven at trial, and at least $526,336;

4      2.      Interest and finance charges to be determined at trial;

5      3.      Costs of suit, including reasonable attorneys' fees; and

6      4.      Such further relief as the Court may deem proper.

7

DATED: December 13, 2017                    PROCOPIO, CORY, HARGREAVES & SAVITCH LLP

8

9

10      By:                    /s/Tyler M. Paetkau

11          Tyler M. Paetkau (Bar No. 146305)
            Alyssa Aiko Yamakawa (Bar No. 234853)
            Attorneys for Plaintiffs

12          Scott L. Powell and John S. Mills

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28