1     Tyler M. Paetkau (Bar No. 146305)
      E-mail:tyler.paetkau@procopio.com
2     Alyssa Aiko Yamakawa (Bar No. 234853)
      E-mail:aiko.yamakawa@procopio.com
3     PROCOPIO, CORY, HARGREAVES & SAVITCH LLP
      1117 S. California Avenue, Suite 200
4     Palo Alto, CA  94304
      Telephone: 650.645.9000
5

6     Attorneys for Plaintiffs
      Scott Powell and John Mills
7

8                 UNITED STATES DISTRICT COURT

9           FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11

| | |
|---|---|
| SCOTT L. POWELL and JOHN S. MILLS, | Case No. 4:17-cv-07104-JSW |
| Plaintiffs, | **FIRST AMENDED COMPLAINT FOR DAMAGES (SECURITIES FRAUD AND BREACH OF CONTRACT)** |
| v. | |
| NEPHOSCALE, INC. and BRUCE TEMPLETON, | **JURY TRIAL REQUESTED** |
| Defendants. | |

Plaintiffs SCOTT POWELL and JOHN MILLS allege as follows:

## I.    THE PARTIES

1.    Plaintiff Scott Powell is, and at all times mentioned in this Complaint was, an individual residing at 1301 46th Street, Sacramento, California 95822.

2.    Plaintiff John Mills is, and at all times mentioned in this Complaint was, an individual residing at 185 Harcross Road, Woodside, California 94062.

3.    Upon information and belief, Defendant NephoScale, Inc., formerly known as Silicon Valley Webhosting, Inc. ("NephoScale," "Silicon Web Hosting," or the "Company"), is, and at all times relevant to this Complaint was, a corporation organized and existing under the laws of California, with its principal place of business located at 95 S Market St. #648, San Jose, CA 95113.

4.      Upon information and belief, Defendant Bruce Templeton ("Defendant Templeton" or "Templeton") is, and at all times relevant to this Complaint was, an individual and co-founder of NephoScale, Chief Executive Officer and a member of the Board of Directors of NephoScale.

## II.      JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs' Claims for Relief arise under the laws of the United States.

6.      Venue is proper in the United States District Court for the Northern District of California pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the events and omissions giving rise to the claims alleged herein occurred in this district.   Additionally, the Promissory Notes, as further described below, attached as Exhibits A, B, E and F and incorporated by reference, state at Section 18,

> All disputes and controversies arising out of or in connection with this Note shall be resolved exclusively by the state and federal courts located in Santa Clara County in the State of California, and each of the Company and Investor hereby agrees to submit to the jurisdiction of said courts and agrees that venue shall lie exclusively with such courts.

## III.      FACTUAL BACKGROUND

7.      On or about December 20, 2013, Defendant Templeton telephoned Mr. Mills and asked him for an emergency bridge loan of $40,000.   Defendant Templeton told Mr. Mills that without an immediate injection of capital he would miss payroll for his employees.   Defendant Templeton further told Mr. Mills that he was tired and burned out from running Silicon Valley Web Hosting, Inc., which corporation was later renamed NephoScale, Inc., and that, beginning in January 2014, he intended to launch a sales process to sell Silicon Valley Web Hosting to a third-party acquirer, and that the proceeds from the loan would be used to achieve a sale of Silicon Valley Web Hosting or its assets and repay the loan from Mr. Mills.

8.      During the December 20, 2013 telephone call and in various other telephone conversions between Mr. Mills and Defendant Templeton, Defendant Templeton also made

numerous representations to Mr. Mills that Silicon Valley Web Hosting was close to "break-even" and that Defendant Templeton had a number of pending customer deals in his pipeline that would take Silicon Valley Webhosting to break-even and beyond.

9.     During the December 20, 2013 telephone call and in several follow-up telephone calls from Defendant Templeton to Mr. Mills prior to December 26, 2013, Defendant Templeton made further representations to Mr. Mills that even if the pending customer deals fell through, he had the ability and a plan to trim expenses in order to get Silicon Valley Web Hosting to break-even, and that Silicon Valley Web Hosting's revenue generating assets and customers could be used to repay the loan within six months if a sale of the Company had not yet materialized and that Defendant Templeton had invested $4 million of his own money in the Company and that "over his dead body" would he lose $4 million, or words to that effect.

10.     Mr. Mills had no reason to doubt Defendant Templeton's representations, and in fact, Mr. Mills previously loaned Defendants $85,000, and Defendants paid that sum back to Mr. Mills.  In reasonable reliance upon Defendant Templeton's representations during the telephone conversations between December 20 through 26, 2013, Mr. Mills agreed to provide Defendants with an emergency bridge loan of $40,000 and funded such amount via wire transfer to the Silicon Valley Webhosting account on December 26, 2013.  The loan was evidenced by a promissory note signed by Defendant Templeton on behalf of Silicon Valley Webhosting, Inc., doing business as NephoScale, a true and correct copy of which is attached as Exhibit A and incorporated by reference ("Promissory Note").  Although Defendant Templeton presented a draft Note Purchase Agreement to Mr. Mills, Mr. Mills did not at the time and has never signed that agreement due to that fact that there remained unresolved terms between the Parties concerning the Promissory Note. On or about January 23, 2014, Silicon Valley Web Hosting, Inc. filed a Certificate of Amendment of Articles of Incorporation with the California Secretary of State reflecting the amended name of the corporation, "Nephoscale, Inc."

11.     In March 2014, Defendant Templeton telephoned Mr. Mills again and solicited additional loan proceeds from Mr. Mills using the same fraudulent sales pitch:  Defendant Templeton and his team wanted to sell the Company and needed additional bridge funding to give

them "runway" in order to complete a sales transaction and that, barring an imminent sale, Silicon Valley Web Hosting was on the verge of break-even status and the Company would be able to repay Mr. Mills either through a sale of Silicon Valley Webhosting or its assets, or with cash flow generated from operations achieved by new customer wins, expense reductions or some combination thereof.

12.    In reasonable reliance upon Defendant Templeton's oral representations in March 2014, Mr. Mills agreed to, and did, provide Defendants with an additional loan of $10,000.  The loan was evidenced by a promissory note signed by Defendant Templeton on behalf of NephoScale, a true and correct copy of which is attached as Exhibit B and incorporated by reference (also, a "Promissory Note" and collectively with Exhibit A, "Promissory Notes").

13.    Plaintiff Mills previously loaned Defendants $85,000, and Defendants paid that sum back to Plaintiff.  Particularly in light of this prior experience, Plaintiff Mills reasonably relied upon Defendant Templeton's representations and promises set forth in paragraphs 7 through 12, which were materially and intentionally false and misleading in agreeing to loan money at Defendants' request.

14.    On or about April 28, 2014, Defendant Templeton contacted Plaintiff Powell by email and phone to convince Mr. Powell to invest in promissory notes, representing to Mr. Powell that the Company had a number of pending customer deals that would bring in $50,000 or more in monthly recurring revenue, and thus bringing the Company into profitability without the need of spending additional capital:

> We are at a negative cash flow run rate of about minus $30K/mo.-$50K/mo. - depending upon the month. We had it down to about $15K/mo. just about a month ago, but lost another $25K in the IP address rental revenue since then to only put us back where we were. I do think we can get back to breakeven in the next couple of months by tapping several potential sources of revenue. We do have a growing sales pipeline in place, outside of our work with HDS.
> We are launching a new unique, and we think disruptive, SSD

1                  Virtual/SSD Dedicated w/ 10 Gbps solution at the end of this month.

2                  We call it ultra-performance Hybrid Compute. We think it will add

3                  significantly to customer traction and additional revenue over the

4                  remaining part of the year. There are several customers waiting for us

5                  to launch it so they can use it. The money to develop this new

6                  offering has already been spent on engineering and equipment, and

7                  the equipment needed for the infrastructure footprint required to

8                  launch has already been purchased. We have enough computing and

9                  storage capacity in place now to add about $50k/month in revenue in

10                cloud services, without spending hardly a dime on equipment.

11  Attached as Exhibit C and incorporated by reference is a true and correct copy of the April 28,

12  2014 email from Defendant Templeton to Mr. Powell.

13        15.     On April 28, 2014, Defendant Templeton also represented to Mr. Powell in an email

14  that the noteholders would receive an exceptional return on their money in a short period of time:

15                  I'm extremely confident we are going to be successful, and that we

16                  are going to create an excellent return for our noteholders, and it will

17                  likely happen in a short period of time based upon what we built and

18                  what is happening in the market.

19  Exhibit C.

20        16.     Defendant Templeton further represented to Mr. Powell, orally in their telephone

21  conversations and in email, that this was the last time the Company would be offering convertible

22  notes at a $7 million valuation and would be raising money at $20 million to $30 million valuation

23  if the Company had not already been sold:

24                  Hitachi goes without saying, it is a big opportunity for the company

25                  in so many ways.  The revenue from the HDS alone will help with

26                  grow NephoScale's revenue through added sales and marketing

27                  investment and it will accelerate the development of our intellectual

28                  property.  It will also attract investors that have been on the sideline.

1                    Once this $1M note is filled out we will not be selling any more of

2                    the company at a $7M valuation.  The valuation would be more like

3                    $20-30M if we did take in more money.

4    Exhibit C.

5          17.     Defendant Templeton also provided to Mr. Powell a term sheet dated April 25,

6    2014, a true and correct copy of which is attached as Exhibit D and incorporated by reference.

7          18.     Based on the Defendant Templeton's repeated representations and promises alleged

8    above, Mr. Powell indicated to Defendant Templeton that he was willing to invest $50,000.

9          19.     On or about April 29, 2014, Defendant Templeton called Mr. Powell with the intent

10    to induce Mr. Powell to invest more than $50,000.  To land additional investment dollars from Mr.

11    Powell, Defendant Templeton sold Mr. Powell on that fact that NephoScale would be sold within

12    six months, likely to Hitachi or a similar corporate buyer, and that he had invested $4 million of his

13    own money in the Company and that Mr. Powell would reap a 3x return on his investment in a very

14    short period of time, or words to that effect.  Based on these representations and promises from

15    Defendant Templeton, Mr. Powell agreed to increase his investment amount from $50,000 to

16    $100,000.  Attached as Exhibit E and incorporated by reference is a true and correct copy of the

17    promissory note signed by Defendant Templeton on behalf of NephoScale evidencing the loan

18    (also, a "Promissory Note" and collectively with Exhibits A and B, "Promissory Notes").

19          20.     Having no reason to doubt Defendant Templeton's representations, Plaintiff Powell

20    reasonably relied upon Defendant Templeton's representations and promises set forth in

21    paragraphs 14 through 19 which were materially and intentionally false and misleading in making

22    his investment decision regarding the Promissory Notes.

23          21.     On December 8, 2014, Mr. Mills made a final loan of $10,000 to Nephoscale to

24    provide funds to achieve the sale of NephoScale as promised by Defendant Templeton. Attached as

25    Exhibit F and incorporated by reference is a true and correct copy of the promissory note signed by

26    Defendant Templeton on behalf of NephoScale (also, a "Promissory Note" and collectively with

27    Exhibits A, B and E, "Promissory Notes").

28          22.     Defendant Templeton made little or no effort to sell the Company as he had

promised Plaintiffs, and was a primary basis for their investment decision.  Rather, Defendant Templeton used the proceeds of the loans from Mr. Mills and Mr. Powell to continue paying his salary and pursuing his dream of transforming Silicon Valley Web Hosting from a hosting company into a venture-backed software licensing company called NephoScale, with the hope of attracting venture capital funding and pursuing an initial public offering (an "IPO").

23.     At the same time that Defendant Templeton was promising Mills and Powell "a quick exit with 3x returns," or words to that effect, he was telling other potential investors that he had no interest in pursuing an acquisition and wanted to go for venture capital funding and an IPO. Following an investor meeting between Defendant Templeton and Timothy Dick, a partner at Startup VC, on or about May 9, 2014, Mr. Dick reported the following: "Bruce is focused on an IPO and not seeking an acquisition even if attractive (we pushed him on this quite hard, he really wants that experience.)" Defendant Templeton knew that in order to convince Plaintiffs to invest, he needed to pitch a short investment term.  Defendant Templeton had approached Mr. Mills in February of 2013, approximately nine months prior to Mr. Mills' original investment to try and convince Mr. Mills to loan Nephoscale $50,000 and Mr. Mills refused to do so unless he would be paid back in three months.  Based on this experience, Defendant Templeton intentionally and falsely promised Plaintiffs a "quick exist with 3x returns," as evidenced by the fact that he was telling other potential investors a different and contradictory story involving a longer investment term.

24.     Contrary to Defendant Templeton's representations to Plaintiffs that he was burned out and ready to sell Silicon Valley Webhosting, once he had secured funding through Plaintiffs, as evidenced by the Promissory Notes, and others, he began transforming Silicon Valley Web Hosting, a service provider on the verge of being cash-flow positive, into NephoScale, a software development company burning cash at a furious rate.

25.     Defendant Templeton had a practice of telling investors that he had invested $4 million of his "own money" in Silicon Valley Web Hosting and that any investment was a safe investment because he would never allow for a loss of his own funds and the investors would be paid before he received any payout.  In fact, Defendant Templeton made that representation to Mr.

FIRST AMENDED COMPLAINT

Mills in their telephone call in December 2013 as part of Defendant Templeton's sales pitch to induce Mr. Mills to invest in the Company and in a separate e-mail to investor Dennis Meinyer dated September 29, 2015. Defendant Templeton wrote in his September 29, 2015 e-mail to Mr. Meinyer to induce him to invest and loan money to Defendant NephoScale:

> Please remember that I have $4M of my money into this company, so we are truly in this together, and over my dead body am I going to lose my money. Also, leasing companies and investors have preference over me in that if we sell for only $5M the leasing financing companies and investors get their money first, and our employees and me get whatever is left over. As an investor you are in a safer place than I am in when it comes to the payout pecking order.

Attached as Exhibit G and incorporated by reference is a true and correct copy of the September 29, 2015 email from Defendant Templeton to Mr. Meinyer.

26. Defendant Templeton had in fact not invested $4 million of his own cash in the Company but only had invested about approximately $1 million. During July 2015, Mr. Mills assisted Defendant Templeton with revisions to the Company's strategic pitch deck via conference calls. Mr. Mills wanted to include Defendant Templeton's oft-quoted statement that Defendant Templeton had invested $4 million in the business, but Defendant Templeton deleted it, finally confessing to Mr. Mills that he had only invested about $1 million, and was counting money earned by the Company over the years that was used for operating the business. Attached as Exhibit H and incorporated by reference is a true and correct copy of an excerpt from the NephoScale sales pitch deck stating in writing that the NephoScale founder only invested $1.25 million.

27. At the time of the loans made by Plaintiffs, Silicon Valley Web Hosting was a service provider, providing shared webhosting, dedicated servers, cloud hosting and leasing Company Internet Protocol version 4 ("IPv4") address space to customers through its data center operations in San Jose (collectively, the "Web Hosting Business"). The hosting customers, physical assets and financial attributes of the Web Hosting Business were the primary source of

revenue and profits for Silicon Valley Web Hosting and the sole basis for Plaintiffs' investment, along with the understanding that the proceeds from the Promissory Notes were to be used to achieve a sale of the Company or its assets.

28.   By early 2015, NephoScale was losing more than $60,000 per month.

29.   In the Fall of 2015, Templeton continued to inform Messrs. Mills and Powell as well as other investors that a profitable sale of Nephoscale "returning a minimum of a 3x return to investors" was imminent.  In an email update on October 8, 2015, Templeton wrote to investors the following:

> "There is some good news and some bad news.  The bad news is that we just had Hitachi delay a $200k PO until December.  We need to raise at least $200k to get through the rest of the year."

> "The good news is that there is sufficient acquisition interest from numerous companies that it is time to run an M&A process with an investment banker.  We think the company can be sold quickly, and that we can return a minimum of 3x return to investors within 3 to 6 months.  The investment banker has done extensive due diligence on us and they also think we can be sold quickly.  We will take any reasonable offer to accelerate the process, we are not going to be greedy and we have no VCs involved on our board to force us in that direction."

Attached as Exhibit I and incorporated by reference is a true and correct copy of Defendant Templeton's email to Mr. Mills dated October 8, 2015.

30.   In the first half of 2015, when Defendant Templeton could no longer raise additional capital from new outside investors or from any of the Company's existing investors, he began secretly liquidating the Web Hosting Business in order to pay operating and payroll expenses for their software development efforts.  The liquidation of the Web Hosting Business assets began with the sale of Company IPv4 address space and shared hosting customers in a series of transactions starting in the first half of 2015 for approximately $200,000, and culminating in October 2015, when Defendant Templeton sold all of the Company's dedicated hosting customers and hardware, its most valuable revenue generating assets, for $565,000 to Denetron, LLC, a company owned by

Daniel Ballenger, a NephoScale employee at the time, in an insider, fire sale transaction at a time when NephoScale was effectively insolvent (the "Denetron Sale").

31.     Rather than repaying Mr. Mills and Mr. Powell with the proceeds from these assets in accordance with terms of the Promissory Notes (and which assets were the basis of the investment decision by Mr. Mills and Mr. Powell), Defendant Templeton used such proceeds to continue paying his salary and for his personal benefit at the expense and detriment of Plaintiffs as creditors of NephoScale despite the fact that the Promissory Notes were due.

32.     Upon learning of the Denetron sale, Mr. Mills and Mr. Powell demanded full repayment pursuant to the terms of the Promissory Notes. In an email dated October 21, 2015, Mr. Mills stated:

> I want you to repay me and [Mr. Powell] from the proceeds of the
> sale of the hosting business. We did a bridge to help get you to an
> exit, and at the time of our investment you were just about a break-
> even, and with hosting assets, servers, IPs, etc. I was supportive of
> selling the IPs because I didn't believe that you would get separate
> value for those in an M&A. But this is different in that you can't sell
> off a big chunk of your assets and not pay us back. We were pretty
> clear that we were not "equity" investors and that is why we took out
> the conversion feature from our notes.

Attached as Exhibit J and incorporated by reference is a true and correct copy of the email from Mr. Mills to Defendant Templeton dated October 21, 2015.

33.     On October 21, 2015, Defendant Templeton responded to Mr. Mills that he would repay the Promissory Notes and the 3x return:

> Hey John, I hear you, and I want to get your money back asap and will do
> whatever I can to do this. Can we talk about this before you speak with Scott? In
> theory, we have until the expiration date on Dec. 23rd to finalize things, but will
> get your cash back asap if at all possible. I confirmed that both you and Scott do
> have in your promissory notes the right to 3x return (with rights to participate

1     above 3x in case of a sale over $21M) upon acquisition.

2 Exhibit J.

3     34.    In an email dated November 11, 2015, from Defendant Templeton to Mr. Powell,

4 Mr. Templeton stated,

> 5 John has told me that you and he want your money taken out of the investment.  I
> 6 assure you I'm doing everything I can to make that happen asap.  There are legal
> 7 issues with this as it relates to the other noteholders, but the good news is that we do
> 8 have a couple legal opinions available to make this happen.

9     35.    In an email dated March 31, 2016, Mr. Powell again demanded repayment of the

10 notes.  Defendant Templeton responded as follows:

> 11 Hi Scott, I will be sending out an update letter to investors soon.  We
> 12 should be able to pay you and [Mr. Mills] off soon.  I've got a couple
> 13 of different potential avenues to get this done.  We have more big
> 14 news coming soon.  We feel the train has left the station and we
> 15 expect to double our topline revenue this year over last.  will be in
> 16 touch very soon on the pay-back.

17 Attached as Exhibit K and incorporated by reference is a true and correct copy of the email from

18 Defendant Templeton to Mr. Powell dated March 31, 2016.

19     36.    On or about August 18, 2016, both Mr. Mills and Mr. Powell called Defendant

20 Templeton and demanded payment of the Promissory Notes.  Defendant Templeton assured Mr.

21 Mills and Mr. Powell that he would repay the Promissory Notes and represented that he was

22 working with several investors to do so.  On August 19, 2016, Defendant Templeton sent an email

23 to Mr. Powell, with a carbon copy to Mr. Mills, stating:

> 24 Hi Scott, I just spoke with John on the phone.  We secured some
> 25 more funding, using the open convertible note we have still open, to
> 26 get us through the end of the year and even likely to profitability.
> 27 We are closing more and more software deals and the sales pipeline
> 28 is quite active with several engagements, so things are definitely

1
2
3
4
5
6
7

> looking up.  We are working with a few parties interested in funding
> an intuitional round of funding over the next couple of months, and
> at that time we will be converting all note holders to preferred shares
> at the $7M valuation.  You and John are the only investors that have
> communicated a desire to cash out their principal and accumulated
> interest.  It should be no problem to convince investors to pay you
> both off.  I will keep you posted.

8   Attached as Exhibit L and incorporated by reference is a true and correct copy of the email sent by

9   Defendant Templeton to Mr. Powell dated August 19, 2016.

10       37.    In an email dated August 25, 2016, from Mr. Powell to Mr. Templeton, Mr. Powell

11  stated in pertinent part:

12
13
14
15

> I would like to cash out the principle.  Due to the length of time on
> the bridge loan and the way the company has materially changed
> from from [sic] our original deal I am not interested in continuing
> down this path, it is time to move on.

16  Attached as Exhibit M and incorporated by reference is a true and correct copy of the email sent by

17  Mr. Powell to Defendant Templeton dated August 25, 2016.

18       38.    In September 2016, Defendant Templeton spoke to Mr. Powell over the telephone

19  and assumed him that the note would be paid off very soon.

20       39.    In November 2016, Mr. Powell called Defendant Templeton and demanded

21  payment on the note.  Defendant Templeton assured Mr. Powell that the Promissory Note would be

22  paid off by the end of the year.

23       40.    In an email dated February 28, 2017, from Mr. Powell to Defendant Templeton,

24  with a carbon copy to Mr. Mills, Mr. Powell stated,

25  Bruce,

26
27
28

> You have been in default on this note for well over a year.  When we
> last talked in November, you stated that you had every attention of
> getting me paid off by the end of the year (2016).  I never heard from

1    you.

2            I am sick of being lied to, what do we have to do to get this cleaned

3    up?

4        41.    In an email dated March 2, 2017, from Defendant Templeton to Mr. Powell,

5    Defendant Templeton stated in pertinent part,

6            The note is not in default, we have signed signatures from an

7            aggregate majority of investors in the convertible note authorizing

8            the extensions.  The group of investors in the note votes and the

9            majority result applies to all investors in the note.  The only way I

10           can get you out is to get someone to assume your note, and that is

11           because we are not allowed to buy out one investor without offering

12           to buy everyone else out to [sic].  Everyone in the group has to be

13           treated equally.

14           …

15           Our team is committed to seeing this through and we will get you out

16           as soon as we can do so without jeopardizing the company.

17

18           The good news is that we are closer than ever before to making this

19           happen for your, but I cannot promise a date.  I'm hoping we have

20           some good news for you very soon.

21           …

22   Attached as Exhibit N and incorporated by reference is a true and correct copy of the email sent by

23   Defendant Templeton to Mr. Powell dated March 2, 2017.  Mr. Powell forwarded the March 2,

24   2017 email from Defendant Templeton to Mr. Mills on March 3, 2017.

25       42.    In reliance on Defendant Templeton's repeated false representations as alleged

26   above, to wit: (1) sell NephoScale, (2) close imminent customer deals and reduce operating

27   expenses to achieve break-even financial status for the Web Hosting Business, (3) the fact that

28   Defendant Templeton had invested $4 million of his own person money into NephoScale and that

1  Plaintiffs Mills and Powell, as holders of Promissory Notes, would be paid in priority over

2  Defendant Templeton and the employee stockholders, and (4) that the proceeds of the loans would

3  be used for expenses related to selling NephoScale, Plaintiffs loaned Defendant NephoScale a total

4  of $160,000 in Promissory Notes plus interest.  To date, Defendants failed to pay Plaintiffs any

5  loaned amounts or interest earned.

**FIRST CLAIM FOR RELIEF**

**SECURITIES FRAUD - VIOLATION OF SECTION 10(b) OF THE SECURITIES AND**

**EXCHANGE ACT AND RULE 10b-5**

**(Against All Defendants)**

10  43.     Mr. Mills and Mr. Powell re-allege and incorporate herein by reference the

11  allegations in paragraphs 1 through 42, inclusive, above, as though fully set forth herein.

12  44.     Section 2(a)(1) of the Securities Act of 1933, as amended (the "Securities Act"),

13  defines a "security" as follows: "The term ''security'' means any note, stock, treasury stock,

14  security future, security-based swap, bond, debenture, evidence of indebtedness…."

15  45.     The Promissory Notes purchased by the Plaintiffs were unregistered securities sold

16  by the Defendants in reliance on an exemption from registration under the Securities Act.

17  46.     Each of the Promissory Notes offered by Defendants and purchased by Plaintiff also

18  contained the following legend:

19  This Note and the securities issuable upon the conversion thereof

20  have not been registered under the Securities Act of 1933, as

21  amended or the securities laws of any state.  They may not be sold,

22  offered for sale, pledged or hypothecated in the absence of an

23  effective registration statement or laws or an opinion of counsel or

24  other evidence reasonable satisfactory to the corporation that such

25  registration is not required.

26  See attached Exhibits A, B, E and F.

27  47.     As alleged in Paragraphs 7 through 42 above, Defendant Templeton knowingly and

28  intentionally made repeated false representations in connection with the sale of the Promissory to

Plaintiffs. This is a classic "bait and switch" story. Defendant Templeton has spent years trying to land funding from professional venture capital funds with zero success. In desperate need of cash, and with no venture capital funds willing to invest in the Company based on the merits of the Company's assets or business model, they turned to "friends and family" with a disingenuous and misleading story about quickly repaying investors from the sale of the Company. This story is documented in many emails from Defendant Templeton and his countless investor "pitches." In an email from Defendant Templeton to Mr. Mills dated October 9, 2015, Defendant Templeton recounted this technique as working to gain traction with potential investors:

> I've used this with some success over the past few days. "With NephoScale there is an opportunity to get a 3x return with 7% interest in 6 months or less. The company has mature proven technology and is positioned well for an acquisition. After 5 years of development work the company and the team are ready for an acquisition. The company is looking to raise a bridge round of approx. $500k to complete the M&A process.

Attached as Exhibit O and incorporated by reference is a true and correct copy of Defendant Templeton's email to Mr. Mills dated October 9, 2015. Defendant Templeton's representations in connection with his offer and sale of the Promissory Notes to Mr. Mills and Mr. Powell as alleged herein were intentionally, recklessly or negligently false and misleading. Defendant Templeton's false and misleading statements include, without limitation:

> (1) The proceeds of the loans would be used to sell the Company, that and loans would be repaid within 6-12 months and Plaintiffs would earn a 3x return on their capital investment from the sale of the Company;

> (2) close imminent customer deals and reduced operating expenses to achieve break-even financial status for the Web Hosting Business; and

> (3) the fact that Defendant Templeton had invested $4 million of his

own personal money into NephoScale.

48.     As alleged in Paragraphs 7 through 42 above, Defendant Templeton's misrepresentation were material and Mr. Mills and Mr. Powell considered important and actually and reasonably relied on Defendant Templeton's explanations as to how the Promissory Notes would be paid and the fact that he had invested $4 million of his own personal money into Nephoscale in making their decisions to purchase the Promissory Notes.

49.     As alleged in Paragraphs 22 through 31, Defendants knowingly intended to deceive, manipulate and defraud Plaintiffs in making the fraudulent representations.  Defendants' knowing intent to deceive is further evidenced by Defendants' pattern of making false representations.  For example, as recently as at least December 2017, Defendants falsely represented to potential investors that Defendant Templeton was responsible for Foundry Network's approximately $2.5 Billion sale.  This representation is false.  It refers to Foundry Network's sale to Brocade Networks in 2008.  Defendant Templeton was a sales person for Foundry and left Foundry five years earlier in approximately the 2002-2003 timeframe.  Given the timing of his departure from Foundry, Defendant Templeton could not have been responsible for Foundry's sale to Brocade Networks in 2008.  Defendants therefore knew the representation to potential investors was false and knowingly used it to obtain investments.  Similarly, Defendants falsely represented to potential investors that Mr. Telemachus Luu had a role in a "previous cloud exit $50M."  This representation refers to Data Pipe's acquisition of Go-Grid in January, 2015.  However, Mr. Luu left his position as a product manager at Go-Grid in 2011, years prior to Data Pipe's acquisition of Go-Grid.  In light of the timing of his departure from Go-Grid, Mr. Luu could not have had a role in the Go-Grid acquisition, and therefore Defendants knew that their representation to potential investors regarding the "previous cloud exit $50M" was false and knowingly used it to obtain investments.  Defendants' pattern and scheme of making false representations, such as representing that investors would receive a quick return on funds through a mergers and acquisitions process, that Defendants were about to sell the company, and that the co-founders were responsible for $2.5B and $50M acquisitions of their prior companies, further evidence Defendants' intent to knowingly make false representations to try and convince potential investors to invest in NephoScale.  Additionally,

Defendants have made an effort to keep the note investors separated from one another. Defendants have not sent group emails to investors, nor have they called any meetings of noteholders. Defendants' highly unusual conduct appears to be an intentional effort to keep noteholders from speaking to one another and discovering the falsity of Defendants' representations. Attached as Exhibit Q and incorporated by reference is a true and correct copy of a slide containing Defendants' false representations in December 2017 regarding the "$2.5B exit" and "Previous cloud exit $50M."

50.     As alleged in Paragraph 42, Plaintiffs suffered actual damages in an amount to be proved at trial and at least in the principal amounts of the Promissory Notes plus interest as a result of Defendants fraudulent representations and failure to timely pay the Promissory Notes.

51.     The statute of limitations period for this securities fraud claim did not begin to run until the Plaintiffs discovered the facts constituting the violation, including the Defendants' fraudulent intent. It took Plaintiffs Mills and Powell additional time to appreciate Defendants' fraudulent intent in light of Defendants' continued assurances that the Promissory Notes would be paid off, as alleged in Paragraphs 29 through 41, above. Consequently, the statute of limitations did not begin to run until at least the beginning of March, 2017. Up until that time, Defendants repeatedly assured Plaintiffs that they would pay the Promissory Notes.

52.     Plaintiffs are entitled to their reasonable attorneys' fees and costs, incurred in connection with this action, pursuant to Section 16 of the Promissory Notes which states:

If action is instituted to collect this Note, the Company agrees to pay all costs and expenses, including without limitation, the Investor's reasonable attorneys' fees and costs, incurred in connection with such action. The Company hereby waives notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor and all other notices or demands relative to this instrument.

**SECOND CLAIM FOR RELIEF**

**BREACH OF CONTRACT**

**(Against All Defendants)**

53.     Mr. Mills and Mr. Powell re-allege and incorporate by reference the allegations in

Paragraphs 1 through 52, inclusive, above, as though fully set forth herein.

54.     Defendants duly made, executed and delivered to Plaintiffs the Promissory Notes attached hereto as Exhibits A, B, E and F.

55.     In the Promissory Notes, Defendants expressly promised to pay to the order of Plaintiffs, the aggregate principal sum of $160,000, together with interest at the rate of 7% per annum, compounded annually.  In addition, Section 6(b) of the Promissory Notes provide for the payment of a premium in the event of a "Change of Control" as follows:

> (b) Payment Upon a Change of Control. If the Company shall have a Change of Control at any time while this Note remains outstanding the Company shall pay the Investor an amount equal to the sum of (i) the outstanding principal amount of the Note, plus (ii) an additional two times the outstanding principal on the Note at the time of the consummation of the Change of Control transaction, plus (iii) all accrued interest.

56.     A "Change of Control" includes a sale of all or substantially all of the assets of the Company.  The definition of "Change of Control" under Section 1(c) of the Promissory Notes, in pertinent part states as follows:  "(c) Change of Control" shall mean: … (ii) a sale, lease or other conveyance of all [or] substantially all of the assets of the Company."

57.     The sale of the Web Hosting Assets, including the Denetron Sale, constituted a Change of Control under Section 6(b) of the Promissory Notes.  It is well established under California and Delaware corporate law that the term "a sale of substantially all of the assets" occurs when the sale of assets accounting for more than 50% of the company's revenue generating assets has occurred.  Upon the occurrence of a Change of Control under the Promissory Notes due to the Denetron Sale, the Notes become automatically due and payable and the term of the Promissory Notes cannot thereafter be extended.

58.     On November 1, 2015, the closing of the Denetron Sale, the Promissory Notes became immediately due and payable in following amount:

> $160,000 in principal

1       $320,000 in change of control premium

2       $46,336, in accrued interest

3       Total due: $526,336

4       59.     In the alternative, in the event that the Court finds that a "sale of substantially all of

5   the assets" triggering Change of Control did not occur, payment of the entire principal and accrued

6   interest amount was due on the stated maturity dates in the Promissory Notes or as a result of an

7   "Event of Default" under Section 4(d)(ii) of the Promissory Notes ("the Company shall be unable,

8   or admit in writing its inability, to pay its debts generally as they mature.")  The Court need not

9   determine whether the Promissory Notes were legally extended beyond the original maturity dates,

10  as the Promissory Notes accelerated and became immediately due and payable upon the following

11  events: (1) the liquidation of the Webhosting Assets outside the ordinary course of business as the

12  only means of keeping the Company afloat, and (2) the Company was insolvent.

13      60.     Among other things, Defendant Templeton sent e-mails to NephoScale's investors,

14  including Mr. Mills:

15              As far as our cash needs go, we are trying to get in about $200k on

16              the convertible note (see attached terms sheet) by the end of Oct. to

17              give us time for some of the other things from the pipeline to fall into

18              place.  Our pipeline shows $200k coming from Hitachi, $200k from

19              iService, and another $200k from Spirent - all in Q4.  The problem

20              we face right now is the cash shortage we are facing between now

21              and the middle of Nov. to the beginning of Dec…..  We are burning

22              about $100k/mo. right now if we base the revenue projections solely

23              upon what we get from recurring monthly revenue from the hosting

24              side of the business.

25  Attached as Exhibit P and incorporated by reference is a true and correct copy of the email sent by

26  Defendant Templeton to Mr. Mills.

27      61.     In October 2015, Defendant Templeton admitted to Mr. Mills that the Company had

28  not paid its colocation and data center bills in months and was about to be locked out or shut off,

1  and that Defendant Templeton had blocked the automatic debit to the IRS for the payment of the

2  employer portion of payroll taxes or otherwise their account would be overdrawn.

3       62.    Section 5 of The Promissory Notes provide that "upon the occurrence or existence

4  of any Event of Default described in Sections 4(d) or 4(e), immediately and without notice, all

5  outstanding Obligations payable by the Company hereunder shall automatically become due and

6  payable, without presentment, demand, protest or any other notice of any kinds, all of which are

7  hereby expressly waived, notwithstanding anything to the contrary contained in any Transaction

8  Document." Thus, the default and acceleration provisions of Section 4(d)(ii) and 4(e) cannot be

9  cured and are exempt from any approvals, waivers or extensions by the holders of a Majority of the

10  Notes.

11      63.    The sale of the Web Hosting business was made to an insider at below market,

12  value, at a time when the Company was insolvent or inadequately capitalized.  The plain language

13  of the Promissory Notes under the Change of Control provision and the Events of Default were

14  intended to protect the Plaintiff Promissory Note holders from such situations.  As set forth in

15  Paragraphs 21 through 25 above, each of which are incorporated by reference hereon, Defendant

16  Templeton further deceived Plaintiffs by assuring them they would be repaid by the end of the year

17  and that he had a number of interested parties willing to take over their Notes. None of these

18  statements were true and Defendants continue to be in breach of their payment obligations under

19  the Promissory Notes.

20      64.    "Insolvency" is generally defined with reference to a corporate entity, as a financial

21  condition such that the sum of such entity's debts is greater than all of such entity's property, at a

22  fair valuation.  The value of the Company's assets at that time was effectively zero as no third

23  parties would invest money in NephoScale.  Under the UFTA, a debtor who is not generally paying

24  its debts as they become due is presumed to be insolvent.

25      65.    Upon an Event of Default, the Promissory Notes provided for the acceleration of all

26  unpaid outstanding principal and interest to be immediately due and payable.

27      66.    Upon default, the Promissory Notes provided for the payment of all reasonable

28  out-of-pocket expenses of Plaintiffs (including reasonable fees of their counsel) in connection with

the enforcement of any provision of the Promissory Notes or the collection of the Promissory Notes.

67.     Defendants have failed, and continue to fail, to pay the $160,000 in outstanding principal and accrued interest as required by the terms of the promissory note, though requested to do so.

68.     Plaintiffs have requested full repayment of the Promissory Notes on numerous occasions including notifying Defendant of the default under the Promissory Notes and demanded that Defendant make immediate repayment plan of all amounts due under the Promissory Notes. As of the date hereof, Plaintiffs have received no payments on the debt, nor any commitment to a repayment plan of the debt.

69.     Defendant's failure and refusal to pay has caused Plaintiffs at least $505,000 in damages.

70.     In the alternative, in the event that a Change of Control did not occur, payment of the entire principal and interest was due on December 26, 2016 (the "Extended Maturity Date"). Plaintiffs are entitled to their reasonable attorneys' fees and costs, incurred in connection with this action, pursuant to Section 16 of the Promissory Notes which states:

> If action is instituted to collect this Note, the Company agrees to pay all costs and expenses, including without limitation, the Investor's reasonable attorneys' fees and costs, incurred in connection with such action.   The Company hereby waives notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor and all other notices or demands relative to this instrument.

## IV.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants for:

1.     Compensatory damages in an amount to be proven at trial, and at least $526,336;

2.     Interest and finance charges to be determined at trial;

3.     Costs of suit, including reasonable attorneys' fees; and

1        4.      Such further relief as the Court may deem proper.

2

3    DATED: October 23, 2018              PROCOPIO, CORY, HARGREAVES & SAVITCH LLP

4

5                                        By:_____/s/Tyler M. Paetkau_____
                                            Tyler M. Paetkau (Bar No. 146305)
6                                           Alyssa Aiko Yamakawa (Bar No. 234853)
                                            Attorneys for Plaintiffs
7                                           Scott L. Powell and John S. Mills

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

**THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED OR THE SECURITIES LAWS OF ANY STATE. THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT AS TO THE SECURITIES UNDER SAID ACT OR LAWS OR AN OPINION OF COUNSEL OR OTHER EVIDENCE REASONABLY SATISFACTORY TO THE CORPORATION THAT SUCH REGISTRATION IS NOT REQUIRED.**

Silicon Valley Web Hosting, Inc. dba NephoScale

**CONVERTIBLE PROMISSORY NOTE**

$40,000.00                    Issuance Date:  December 26th, 2013                    CPN-A-5

FOR VALUE RECEIVED, Silicon Valley Web Hosting, Inc., doing business as NephoScale, a California corporation (the "**Company**") promises to pay to John Mills (the "**Investor**"), or its registered assigns, in lawful money of the United States of America the principal sum of forty thousand dollars ($40,000.00), or such lesser amount as shall equal the outstanding principal amount hereof, together with interest from the date of this Convertible Promissory Note (the "**Note**") on the unpaid principal balance at a rate equal to 7% per annum, computed on the basis of the actual number of days elapsed and a year of 365 days.  To the extent not previously converted in accordance with **Section** 6 hereof, all unpaid principal, together with any then unpaid and accrued interest and other amounts payable hereunder, shall be due and payable on the earlier of (i) December 26, 2015 (the "**Maturity Date**"), (ii) upon a Change of Control as defined and as set forth below, or (iii) when, upon or after the occurrence of an Event of Default (as defined below), such amounts are declared due and payable by the Investor or made automatically due and payable in accordance with the terms hereof.  This Note is one of the "Notes" issued pursuant to a Note Purchase Agreement, as defined below.

The following is a statement of the rights of the Investor and the conditions to which this Note is subject, and to which the Investor, by the acceptance of this Note, agrees:

1. *Definitions*. As used in this Note, the following capitalized terms have the following meanings:

(a) "**Affiliate**" has the meaning ascribed to such term in Rule 405 promulgated under the Securities Act.

(b) "**Applicable Price Per Share**" shall mean an amount per share equal to the lesser of (i) 80% of the price per share paid by investors in the Qualified Equity Financing, or (ii) the price per share determined at the time of the Qualified Equity Financing based upon a pre-money valuation of $7,000,000.

(c) "**Change of Control**" shall mean: (i) the acquisition of the Company by another entity by means of any transaction or series of related transactions to which the Company is party (including, without limitation, any stock acquisition, reorganization, merger or consolidation but excluding any sale of stock for capital raising purposes) other than a transaction or series of transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction continue to retain (either by such voting securities remaining outstanding or by such voting securities being converted into voting securities of

the surviving entity), as a result of shares in the Company held by such holders prior to such transaction, at least fifty percent (50%) of the total voting power represented by the voting securities of the Corporation or such surviving entity outstanding immediately after such transaction or series of transactions; or (ii) a sale, lease or other conveyance of all substantially all of the assets of the Company.

(d) The "**Company**" shall mean the corporation initially executing this Note and any person that succeeds to or assumes the obligations of the Company under this Note.

(e) "**Event of Default**" has the meaning given in **Section** 4 hereof.

(f) "**Majority in Interest of Investors**" shall mean Investors holding more than 50% of the aggregate outstanding principal amount of the Notes.

(g) "**Note Purchase Agreement**" shall mean the Note Purchase Agreement, dated as of December 20, 2013 (as amended, modified or supplemented), by and among the Company and the Investors (as defined in the Note Purchase Agreement) party thereto.

(h) "**Obligations**" shall mean and include all loans, advances, debts, liabilities and obligations, howsoever arising, owed by the Company to the Investor of every kind and description (whether or not evidenced by any note or instrument and whether or not for the payment of money), now existing or hereafter arising under or pursuant to the terms of this Note, each of the other Notes, the Note Purchase Agreement and each other agreement, schedule, exhibit, certificate or other document delivered in connection herewith and therewith, including, all interest, fees, charges, expenses, attorneys' fees and costs and accountants' fees and costs chargeable to and payable by the Company hereunder and thereunder, in each case, whether direct or indirect, absolute or contingent, due or to become due, and whether or not arising after the commencement of a proceeding under Title 11 of the United States Code (11 U. S. C. Section 101 *et seq.*), as amended from time to time (including post-petition interest) and whether or not allowed or allowable as a claim in any such proceeding.

(i) "**Preferred Stock**" shall mean a series of Preferred Stock of the Company.

(j) "**Qualified Equity Financing**" shall mean a bona fide equity financing, with the principal purpose of raising capital, pursuant to which the Company sells shares of a series of Preferred Stock with aggregate gross proceeds to the Company of not less than $500,000, excluding any and all notes which are converted into Preferred Stock (including this Note and the other Notes, if any, issued under the Note Purchase Agreement).

(k) "**Securities Act**" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

(l) "**Senior Indebtedness**" shall mean, unless expressly subordinated to or made on a parity with the amounts due under this Note, the principal of (and premium, if any), unpaid interest on and amounts reimbursable, fees, expenses, costs of enforcement and other amounts due in connection with, (i) indebtedness for borrowed money of the Company, to banks, commercial finance lenders or other lending institutions regularly engaged in the business of lending money (excluding (A) any indebtedness convertible into equity securities of the Company and (B) indebtedness in connection with capital leases or operating leases used solely for the purchase, finance or acquisition of equipment and where such indebtedness is secured solely by such equipment), and (ii) any extension, refinance, renewal, replacement, defeasance or refunding of any indebtedness described in clause (i).

*SV 347319283v2*

2.  *Interest*.  Accrued interest on this Note shall be payable at maturity.

3.  *Prepayment*.  This Note may not be prepaid without the consent of a Majority in Interest of Investors. Any prepayment must be paid pro rata to all Investors based on the principal amount of the Notes.

4.  *Events of Default*. The occurrence of any of the following shall constitute an "**Event of Default**" under this Note and the Note Purchase Agreement:

(a)  *Failure to Pay*.  The Company shall fail to pay (i) when due any principal or interest payment on the due date hereunder or (ii) any other payment required under the terms of this Note or any other Transaction Document on the date due and such payment shall not have been made within ten (10) days of the Company's receipt of the Investor's written notice to the Company of such failure to pay; or

(b)  *Breaches of Covenants*. The Company or any of its Subsidiaries shall fail to observe or perform any other covenant, obligation, condition or agreement contained in this Note, the other Notes, the Note Purchase Agreement or any other agreement, schedule, exhibit, certificate or other document delivered in connection herewith and therewith (other than those specified in **Section 4(a)** above) and such failure shall continue for ten (10) days; or

(c)  *Representations and Warranties*. Any representation, warranty, certificate, or other statement (financial or otherwise) made or furnished by or on behalf of the Company to the Investor in writing in connection with any Transaction Document, or as an inducement to the Investor to enter into any Transaction Document, shall be false, incorrect, incomplete or misleading in any material respect when made or furnished; or

(d)  *Voluntary Bankruptcy or Insolvency Proceedings*. The Company or any of its Subsidiaries shall (i) apply for or consent to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, (ii) be unable, or admit in writing its inability, to pay its debts generally as they mature, (iii) make a general assignment for the benefit of its or any of its creditors, (iv) be dissolved or liquidated, (v) become insolvent (as such term may be defined or interpreted under any applicable statute), (vi) commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it, or (vii) take any action for the purpose of effecting any of the foregoing; or

(e)  *Involuntary Bankruptcy or Insolvency Proceedings*. Proceedings for the appointment of a receiver, trustee, liquidator or custodian of the Company or any of its Subsidiaries or of all or a substantial part of the property thereof, or an involuntary case or other proceedings seeking liquidation, reorganization or other relief with respect to the Company or any of its Subsidiaries or the debts thereof under any bankruptcy, insolvency or other similar law now or hereafter in effect shall be commenced and an order for relief entered or such proceeding shall not be dismissed or discharged within 30 days of commencement; or

(f)  *Material Terms*. Either this Note or the Note Purchase Agreement or any material term thereof shall cease to be, or be asserted by the Company not to be, a legal, valid and binding obligation of the Company enforceable in accordance with its terms.

5.  *Rights of the Investor upon Default*. Upon the occurrence or existence of any Event of Default (other than an Event of Default described in **Sections 4(d)** or **4(e)**) and at any time thereafter during the

-3-

continuance of such Event of Default, the Investor may, with the written consent of a Majority in Interest of the Investors, by written notice to the Company, declare all outstanding Obligations payable by the Company hereunder to be immediately due and payable without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived, notwithstanding anything to the contrary contained in any Transaction Document. Upon the occurrence or existence of any Event of Default described in **Sections 4(d)** or **4(e)**, immediately and without notice, all outstanding Obligations payable by the Company hereunder shall automatically become immediately due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived, notwithstanding anything to the contrary contained in any Transaction Document. In addition to the foregoing remedies, upon the occurrence or existence of any Event of Default, the Investor may, with the written consent of a Majority in Interest of the Investors, exercise any other right power or remedy granted to it by any Transaction Document or otherwise permitted to it by law, either by suit in equity or by action at law, or both. The Investor shall have a full right of offset for any amounts due upon such a default against any amounts payable by the Investor to the Company.

6. ***Conversion; Payment upon a Change of Control.***

(a) *Automatic Conversion.* In the event that, prior to the Maturity Date, the Company consummates a Qualified Equity Financing, then the outstanding principal amount due under this Note plus all accrued interest shall automatically convert into shares of the Preferred Stock issued in the Qualified Equity Financing at the Applicable Price Per Share and otherwise on the same terms (including the same rights, preferences and privileges) as the other investors that purchase shares of Preferred Stock in the Qualified Equity Financing. Upon such conversion of this Note, the Investor hereby agrees to execute and deliver to the Company all transaction documents related to the Qualified Equity Financing, including a purchase agreement and other ancillary agreements, with customary representations and warranties and transfer restrictions (including a 180-day lock-up agreement in connection with an initial public offering), and having the same terms as those agreements entered into by the other purchasers of the Preferred Stock in the Qualified Equity Financing. The Investor also agrees to deliver the original of this Note at the closing of the Qualified Equity Financing for cancellation; *provided, however*, that upon satisfaction of the conditions set forth in this **Section 6(a)**, this Note shall be deemed converted and of no further force and effect, whether or not it is delivered for cancellation as set forth in this sentence.

(b) *Payment Upon a Change of Control.* If the Company shall have a Change of Control at any time while this Note remains outstanding the Company shall pay the Investor an amount equal to the sum of (i) the outstanding principal amount of the Note, plus (ii) an additional two times the outstanding principal on the Note at the time of the consummation of the Change of Control transaction, plus (iii) all accrued interest. The Investor agrees to deliver the original of this Note at the closing of the Change of Control for cancellation; *provided, however*, that upon satisfaction of the conditions set forth in this **Section 6(b)**, this Note shall be deemed converted and of no further force and effect, whether or not it is delivered for cancellation as set forth in this sentence.

(c) *Fractional Shares; Interest; Effect of Conversion; Lost Notes.* No fractional shares shall be issued upon conversion of this Note. In lieu of the Company issuing any fractional shares to the Investor upon the conversion of this Note, the Company shall pay to the Investor in cash that amount of the unconverted principal and interest balance of this Note. In addition, the Company shall pay to the Investor any interest accrued on the amount converted and on the amount to be paid to the Company pursuant to the previous sentence. The issuance of any certificate or certificates upon conversion of this Note in accordance with **Section 6** shall be made without charge to the Investor for any tax or charge with respect to the issuance thereof. Upon conversion of this Note in full and the payment of any amounts specified in this **Section 6(c)**, the Company shall be forever released from all its obligations and liabilities under this Note. If

-4-

the original Note has been lost, stolen or destroyed, in lieu of delivering the original Note to the Company pursuant to **Sections 6(a)** through **6(b)** above, the Investor shall deliver notice thereof to the Company, evidence reasonably satisfactory to the Company of the ownership of and the loss, theft, destruction or mutilation of this Note and an agreement acceptable to the Company whereby the holder agrees to indemnify the Company from any loss incurred by it in connection with the lost, stolen, destroyed or mutilated Note.

7.   *Subordination.*   The Obligations evidenced by this Note are hereby expressly subordinated in right of payment to the prior payment in full of all of the Company's Senior Indebtedness and any liens on property of the Company in favor of Investor are hereby expressly subordinated in priority to any liens on the Company's property in favor of any holder of Senior Indebtedness.   By acceptance of this Note, Investor agrees to execute and deliver customary forms of subordination agreement requested from time to time by holders of Senior Indebtedness, and as a condition to Investor's rights hereunder, the Company may require that Investor execute such forms of subordination agreement.   Notwithstanding the foregoing, Investor shall be entitled to receive (i) equity securities of the Company from the conversion of all or any part of the Obligations and payments of cash in lieu of issuing fractional shares in connection with any such conversions, (ii) any note, instrument or other evidence of indebtedness which may be issued by the Company in exchange for or in substitution of this Note, provided that such note, instrument or other evidence of indebtedness is subordinated to the Senior Indebtedness on the same terms and conditions as set forth in this **Section** 7 and (iii) other payments consented to in writing by holders of Senior Indebtedness.

8.   *Pari Passu Notes.*   Investor acknowledges and agrees that the payment of all or any portion of the outstanding principal amount of this Note and all interest hereon shall be pari passu in right of payment and in all other respects to the other Notes and any other indebtedness of the Company convertible into equity securities of the Company, unless expressly subordinated to the amounts due under this Note.   In the event Investor receives payments in excess of its pro rata share of the Company's payments to the Investors of all of the Notes and any other indebtedness of the Company convertible into equity securities of the Company, unless expressly subordinated to the amounts due under this Note, then Investor shall hold in trust all such excess payments for the benefit of the holders of the other securities and shall pay such amounts held in trust to such other holders upon demand by such holders.

9.   *Successors and Assigns.*   Subject to the restrictions on transfer described in **Sections 11** and **12** below, the rights and obligations of the Company and the Investor shall be binding upon and benefit the successors, assigns, heirs, administrators and transferees of the parties.

10.   *Waiver and Amendment.*   Any provision of this Note may be amended, waived or modified upon the written consent of the Company and a Majority in Interest of Investors; *provided, however,* that no such amendment, waiver or consent shall: (i) reduce the principal amount of this Note without Investor's written consent other than prepayment as provided in Section 3 hereof, or (ii) reduce the rate of interest of this Note without Investor's written consent.

11.   *Transfer of this Note or Securities Issuable on Conversion Hereof by Investor.*   With respect to any offer, sale or other disposition of this Note or securities into which this Note may be converted, the Investor will give written notice to the Company prior thereto, describing briefly the manner thereof, together with a written opinion of the Investor's counsel, if requested by the Company, or other evidence reasonably satisfactory to the Company, to the effect that such offer, sale or other distribution may be effected without registration or qualification (under any federal or state law then in effect); *provided, however,* that no such restrictions shall apply and no such opinion shall be required in connection with the offer, sale or other disposition of this Note or securities into which this Note may be converted by the Investor to any Affiliate thereof.   Upon receiving such written notice and reasonably satisfactory opinion, if so required and requested,

-5-

or other evidence, the Company, as promptly as practicable, shall notify the Investor that the Investor may offer, sell or otherwise dispose of this Note or such securities, all in accordance with the terms of the notice delivered to the Company.  If a determination has been made pursuant to this **Section 11** that the opinion of counsel for the Investor, or other evidence, is not reasonably satisfactory to the Company, the Company shall so notify the Investor promptly after such determination has been made and provide a detailed explanation of the basis for such determination.  Each Note thus transferred and each certificate representing the securities thus transferred shall bear a legend as to the applicable restrictions on transferability in order to ensure compliance with the Securities Act and state securities laws, unless in the opinion of counsel for the Company such legend is not required in order to ensure compliance with the Securities Act or state securities laws.  The Company may issue stop transfer instructions to its transfer agent in connection with such restrictions. Subject to the foregoing, transfers of this Note shall be registered upon registration books maintained for such purpose by or on behalf of the Company as provided herein and in the Note Purchase Agreement.  Prior to presentation of this Note for registration of transfer, the Company shall treat the registered holder hereof as the owner and holder of this Note for the purpose of receiving all payments of principal and interest hereon and for all other purposes whatsoever, whether or not this Note shall be overdue and the Company shall not be affected by notice to the contrary. Notwithstanding the foregoing, the Investor may transfer all or any portion of this Note, or securities into which this Note may be converted, to any Affiliate without the prior approval of the Company or any opinion of the Investor's counsel, or other evidence required by the Company; *provided* that the Investor will give written notice to the Company following any such transfers. Any transferee or transferees of this Note of the securities into which this Note may be converted agree to assume the obligations of the holder of this Note as set forth herein, and shall be deemed to be the "Investor" for all purposes hereunder.

12. ***Assignment by the Company.***  Neither this Note nor any of the rights, interests or obligations hereunder may be assigned, by operation of law or otherwise, in whole or in part, by the Company without the prior written consent of the Investor unless all of the Notes are being assigned, in which case a the Notes may be assigned with the consent of a Majority in Interest of the Investors.

13. ***Notices.***  All notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall be delivered in the manner required in the Note Purchase Agreement.

14. ***Payment.***  The Company will make all cash payments due under this Note in immediately available funds by 11:00 a.m. pacific time on the date such payment is due by means of wire transfer to such account as the Investor or other registered holder of a Note may from time to time direct in writing.

15. ***Usury.***  In the event any interest is paid on this Note that is deemed to be in excess of the then legal maximum rate, then that portion of the interest payment representing an amount in excess of the then legal maximum rate shall be deemed a payment of principal and applied against the principal of this Note.

16. ***Expenses; Waivers.***  If action is instituted to collect this Note, the Company agrees to pay all costs and expenses, including, without limitation, the Investor's reasonable attorneys' fees and costs, incurred in connection with such action.  The Company hereby waives notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor and all other notices or demands relative to this instrument.

17. ***Entire Agreement***.  This Note together with the other Notes, the Note Purchase Agreement and each other agreement, schedule, exhibit, certificate or other document delivered in connection herewith and therewith constitute and contain the entire agreement among the Company and the Investor and supersede any

and all prior agreements, negotiations, correspondence, understandings and communications among the parties, whether written or oral, respecting the subject matter hereof.

18. *Governing Law.*  This Note and all actions arising out of or in connection with this Note shall be governed by and construed in accordance with the laws of the State of California, without regard to the conflicts of law provisions of the State of California, or of any other state.  All disputes and controversies arising out of or in connection with this Note shall be resolved exclusively by the state and federal courts located in Santa Clara County in the State of California, and each of the Company and the Investor hereby agrees to submit to the jurisdiction of said courts and agrees that venue shall lie exclusively with such courts.

*(Signature Page Follows)*

SV 347319283v2

The Company has caused this Note to be issued as of the date first written above.

**SILICON VALLEY WEB HOSTING, INC., doing business as NephoScale, a California corporation**

By: _____

Name and Title: _BRUCE TEMPLETON , CEO_

# EXHIBIT B

THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED OR THE SECURITIES LAWS OF ANY STATE. THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT AS TO THE SECURITIES UNDER SAID ACT OR LAWS OR AN OPINION OF COUNSEL OR OTHER EVIDENCE REASONABLY SATISFACTORY TO THE CORPORATION THAT SUCH REGISTRATION IS NOT REQUIRED.

NephoScale, Inc.

## CONVERTIBLE PROMISSORY NOTE

$10,000.00                     Issuance Date: April 22, 2014                     CPN-A-13

FOR VALUE RECEIVED, NephoScale, Inc., a California corporation (the "**Company**") promises to pay to John Mills (the "**Investor**"), or its registered assigns, in lawful money of the United States of America the principal sum of ten thousand dollars [$10,000.00], or such lesser amount as shall equal the outstanding principal amount hereof, together with interest from the date of this Convertible Promissory Note (the "**Note**") on the unpaid principal balance at a rate equal to 7% per annum, computed on the basis of the actual number of days elapsed and a year of 365 days.  To the extent not previously converted in accordance with **Section** 6 hereof, all unpaid principal, together with any then unpaid and accrued interest and other amounts payable hereunder, shall be due and payable on the earlier of (i) December 23, 2015 (the "**Maturity Date**"), (ii) upon a Change of Control as defined and as set forth below, or (iii) when, upon or after the occurrence of an Event of Default (as defined below), such amounts are declared due and payable by the Investor or made automatically due and payable in accordance with the terms hereof.  This Note is one of the "Notes" issued pursuant to a Note Purchase Agreement, as defined below.

The following is a statement of the rights of the Investor and the conditions to which this Note is subject, and to which the Investor, by the acceptance of this Note, agrees:

1.  ***Definitions***. As used in this Note, the following capitalized terms have the following meanings:

(a) "**Affiliate**" has the meaning ascribed to such term in Rule 405 promulgated under the Securities Act.

(b) "**Applicable Price Per Share**" shall mean an amount per share equal to the lesser of (i) 80% of the price per share paid by investors in the Qualified Equity Financing, or (ii) the price per share determined at the time of the Qualified Equity Financing based upon a pre-money valuation of $7,000,000.

(c) "**Change of Control**" shall mean: (i) the acquisition of the Company by another entity by means of any transaction or series of related transactions to which the Company is party (including, without limitation, any stock acquisition, reorganization, merger or consolidation but excluding any sale of stock for capital raising purposes) other than a transaction or series of transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction continue to retain (either by such voting securities remaining outstanding or by such voting securities being converted into voting securities of the surviving entity), as a result of shares in the Company held by such holders prior to such transaction, at

least fifty percent (50%) of the total voting power represented by the voting securities of the Corporation or such surviving entity outstanding immediately after such transaction or series of transactions; or (ii) a sale, lease or other conveyance of all substantially all of the assets of the Company.

(d) The "**Company**" shall mean the corporation initially executing this Note and any person that succeeds to or assumes the obligations of the Company under this Note.

(e) "**Event of Default**" has the meaning given in **Section** 4 hereof.

(f) "**Majority in Interest of Investors**" shall mean Investors holding more than 50% of the aggregate outstanding principal amount of the Notes.

(g) "**Note Purchase Agreement**" shall mean the Note Purchase Agreement, dated as of December 23, 2013 (as amended, modified or supplemented), by and among the Company and the Investors (as defined in the Note Purchase Agreement) party thereto.

(h) "**Obligations**" shall mean and include all loans, advances, debts, liabilities and obligations, howsoever arising, owed by the Company to the Investor of every kind and description (whether or not evidenced by any note or instrument and whether or not for the payment of money), now existing or hereafter arising under or pursuant to the terms of this Note, each of the other Notes, the Note Purchase Agreement and each other agreement, schedule, exhibit, certificate or other document delivered in connection herewith and therewith, including, all interest, fees, charges, expenses, attorneys' fees and costs and accountants' fees and costs chargeable to and payable by the Company hereunder and thereunder, in each case, whether direct or indirect, absolute or contingent, due or to become due, and whether or not arising after the commencement of a proceeding under Title 11 of the United States Code (11 U. S. C. Section 101 *et seq.*), as amended from time to time (including post-petition interest) and whether or not allowed or allowable as a claim in any such proceeding.

(i) "**Preferred Stock**" shall mean a series of Preferred Stock of the Company.

(j) "**Qualified Equity Financing**" shall mean a bona fide equity financing, with the principal purpose of raising capital, pursuant to which the Company sells shares of a series of Preferred Stock with aggregate gross proceeds to the Company of not less than $500,000, excluding any and all notes which are converted into Preferred Stock (including this Note and the other Notes, if any, issued under the Note Purchase Agreement).

(k) "**Securities Act**" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

(l) "**Senior Indebtedness**" shall mean, unless expressly subordinated to or made on a parity with the amounts due under this Note, the principal of (and premium, if any), unpaid interest on and amounts reimbursable, fees, expenses, costs of enforcement and other amounts due in connection with, (i) indebtedness for borrowed money of the Company, to banks, commercial finance lenders or other lending institutions regularly engaged in the business of lending money (excluding (A) any indebtedness convertible into equity securities of the Company and (B) indebtedness in connection with capital leases or operating leases used solely for the purchase, finance or acquisition of equipment and where such indebtedness is secured solely by such equipment), and (ii) any extension, refinance, renewal, replacement, defeasance or refunding of any indebtedness described in clause (i).

-2-

2. *Interest*. Accrued interest on this Note shall be payable at maturity, upon a Change of Control, and in a Qualified Financing at the election of the holder hereof.

3. *Prepayment*. This Note may not be prepaid without the consent of a Majority in Interest of Investors. Any prepayment must be paid pro rata to all Investors based on the principal amount of the Notes.

4. *Events of Default*. The occurrence of any of the following shall constitute an "**Event of Default**" under this Note and the Note Purchase Agreement:

(a) *Failure to Pay*. The Company shall fail to pay (i) when due any principal or interest payment on the due date hereunder or (ii) any other payment required under the terms of this Note or any other Transaction Document on the date due and such payment shall not have been made within ten (10) days of the Company's receipt of the Investor's written notice to the Company of such failure to pay; or

(b) *Breaches of Covenants*. The Company or any of its Subsidiaries shall fail to observe or perform any other covenant, obligation, condition or agreement contained in this Note, the other Notes, the Note Purchase Agreement or any other agreement, schedule, exhibit, certificate or other document delivered in connection herewith and therewith (other than those specified in **Section 4(a)** above) and such failure shall continue for ten (10) days; or

(c) *Representations and Warranties*. Any representation, warranty, certificate, or other statement (financial or otherwise) made or furnished by or on behalf of the Company to the Investor in writing in connection with any Transaction Document, or as an inducement to the Investor to enter into any Transaction Document, shall be false, incorrect, incomplete or misleading in any material respect when made or furnished; or

(d) *Voluntary Bankruptcy or Insolvency Proceedings*. The Company or any of its Subsidiaries shall (i) apply for or consent to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, (ii) be unable, or admit in writing its inability, to pay its debts generally as they mature, (iii) make a general assignment for the benefit of its or any of its creditors, (iv) be dissolved or liquidated, (v) become insolvent (as such term may be defined or interpreted under any applicable statute), (vi) commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it, or (vii) take any action for the purpose of effecting any of the foregoing; or

(e) *Involuntary Bankruptcy or Insolvency Proceedings*. Proceedings for the appointment of a receiver, trustee, liquidator or custodian of the Company or any of its Subsidiaries or of all or a substantial part of the property thereof, or an involuntary case or other proceedings seeking liquidation, reorganization or other relief with respect to the Company or any of its Subsidiaries or the debts thereof under any bankruptcy, insolvency or other similar law now or hereafter in effect shall be commenced and an order for relief entered or such proceeding shall not be dismissed or discharged within 30 days of commencement; or

(f) *Material Terms*. Either this Note or the Note Purchase Agreement or any material term thereof shall cease to be, or be asserted by the Company not to be, a legal, valid and binding obligation of the Company enforceable in accordance with its terms.

SV 347319283v4

5. ***Rights of the Investor upon Default***. Upon the occurrence or existence of any Event of Default (other than an Event of Default described in **Sections 4(d)** or **4(e)**) and at any time thereafter during the continuance of such Event of Default, the Investor may, with the written consent of a Majority in Interest of Investors, by written notice to the Company, declare all outstanding Obligations payable by the Company hereunder to be immediately due and payable without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived, notwithstanding anything to the contrary contained in any Transaction Document. Upon the occurrence or existence of any Event of Default described in **Sections 4(d)** or **4(e)**, immediately and without notice, all outstanding Obligations payable by the Company hereunder shall automatically become immediately due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived, notwithstanding anything to the contrary contained in any Transaction Document. In addition to the foregoing remedies, upon the occurrence or existence of any Event of Default, the Investor may, with the written consent of a Majority in Interest of Investors, exercise any other right power or remedy granted to it by any Transaction Document or otherwise permitted to it by law, either by suit in equity or by action at law, or both. The Investor shall have a full right of offset for any amounts due upon such a default against any amounts payable by the Investor to the Company.

6. ***Conversion; Payment upon a Change of Control***.

(a) *Conversion*. In the event that, prior to the Maturity Date, the Company consummates a Qualified Equity Financing, then the Investor may elect to convert the outstanding principal amount due under this Note plus all accrued interest into shares of the Preferred Stock issued in the Qualified Equity Financing at the Applicable Price Per Share and otherwise on the same terms (including the same rights, preferences and privileges) as the other investors that purchase shares of Preferred Stock in the Qualified Equity Financing. Upon such conversion of this Note, the Investor hereby agrees to execute and deliver to the Company all transaction documents related to the Qualified Equity Financing, including a purchase agreement and other ancillary agreements, with customary representations and warranties and transfer restrictions (including a 180-day lock-up agreement in connection with an initial public offering), and having the same terms as those agreements entered into by the other purchasers of the Preferred Stock in the Qualified Equity Financing. If the Investor elects to convert all or any portion of the principal or interest due under the Note, the Investor also agrees to deliver the original of this Note at the closing of the Qualified Equity Financing for cancellation; *provided, however,* that upon satisfaction of the conditions set forth in this **Section 6(a)**, this Note shall be deemed converted and of no further force and effect, whether or not it is delivered for cancellation as set forth in this sentence. If the Investor elects to not convert all or any portion of the Note principal and interest into the equity issued in the Qualified Equity Financing, then any portion of the principal and interest not converted will be paid to the Investor at the closing of the Qualified Equity Financing.

(b) *Payment Upon a Change of Control*. If the Company shall have a Change of Control at any time while this Note remains outstanding the Company shall pay the Investor an amount equal to the sum of (i) the outstanding principal amount of the Note, plus (ii) an additional two times the outstanding principal on the Note at the time of the consummation of the Change of Control transaction, plus (iii) all accrued interest. In addition, if the Change of Control transaction results in net proceeds payable, at the closing of the Change of Control transaction, to the Company or its stockholders, after transaction expenses and payment of the Company's outstanding debt, of more than $21 million, then for each $7 million dollars of net Change of Control transaction proceeds, or fraction thereof, in excess of $21 million, the Investor will receive an additional one times (or appropriate fraction thereof to correspond to the fraction of $7M referenced above) the principal amount of this Note. The Investor agrees to deliver the original of this Note at the closing of the Change of Control for cancellation; *provided, however*, that upon satisfaction of the conditions set forth in

-4-

this **Section 6(b)**, this Note shall be deemed converted and of no further force and effect, whether or not it is delivered for cancellation as set forth in this sentence.

(c) *Fractional Shares; Interest; Effect of Conversion; Lost Notes.* No fractional shares shall be issued upon conversion of this Note. In lieu of the Company issuing any fractional shares to the Investor upon the conversion of this Note, the Company shall pay to the Investor in cash that amount of the unconverted principal and interest balance of this Note. In addition, the Company shall pay to the Investor any interest accrued on the amount converted and on the amount to be paid to the Company pursuant to the previous sentence. The issuance of any certificate or certificates upon conversion of this Note in accordance with **Section** 6 shall be made without charge to the Investor for any tax or charge with respect to the issuance thereof. Upon conversion of this Note in full and the payment of any amounts specified in this **Section 6(c)**, the Company shall be forever released from all its obligations and liabilities under this Note. If the original Note has been lost, stolen or destroyed, in lieu of delivering the original Note to the Company pursuant to **Sections 6(a)** through **6(b)** above, the Investor shall deliver notice thereof to the Company, evidence reasonably satisfactory to the Company of the ownership of and the loss, theft, destruction or mutilation of this Note and an agreement acceptable to the Company whereby the holder agrees to indemnify the Company from any loss incurred by it in connection with the lost, stolen, destroyed or mutilated Note.

7. ***No Subordination for Future Indebtedness.*** The Obligations evidenced by this Note are hereby expressly subordinated in right of payment to the prior payment in full of all of the Company's currently existing Senior Indebtedness and any related liens thereto. The Company covenants and agrees that it will incur no new Senior Indebtedness without the consent of a Majority in Interest of Investors. With respect to Senior Indebtedness existing on the date hereof, by acceptance of this Note, Investor agrees to execute and deliver customary forms of subordination agreement requested from time to time by holders of such Senior Indebtedness, and as a condition to Investor's rights hereunder, the Company may require that Investor execute such forms of subordination agreement. Notwithstanding the foregoing, Investor shall be entitled to receive (i) equity securities of the Company from the conversion of all or any part of the Obligations and payments of cash in lieu of issuing fractional shares in connection with any such conversions, (ii) any note, instrument or other evidence of indebtedness which may be issued by the Company in exchange for or in substitution of this Note, provided that such note, instrument or other evidence of indebtedness is subordinated to the Senior Indebtedness outstanding as of the date of this Agreement on the same terms and conditions as set forth in this **Section** 7 and (iii) other payments consented to in writing by holders of such Senior Indebtedness.

8. ***Pari Passu Notes.*** Investor acknowledges and agrees that the payment of all or any portion of the outstanding principal amount of this Note and all interest hereon shall be pari passu in right of payment and in all other respects to the other Notes and any other indebtedness of the Company convertible into equity securities of the Company, unless expressly subordinated to the amounts due under this Note. In the event Investor receives payments in excess of its pro rata share of the Company's payments to the Investors of all of the Notes and any other indebtedness of the Company convertible into equity securities of the Company, unless expressly subordinated to the amounts due under this Note, then Investor shall hold in trust all such excess payments for the benefit of the holders of the other securities and shall pay such amounts held in trust to such other holders upon demand by such holders.

9. ***Successors and Assigns.*** Subject to the restrictions on transfer described in **Sections 11** and **12** below, the rights and obligations of the Company and the Investor shall be binding upon and benefit the successors, assigns, heirs, administrators and transferees of the parties.

SV 347319283v4

10. ***Waiver and Amendment.*** Any provision of this Note may be amended, waived or modified upon the written consent of the Company and a Majority in Interest of Investors; *provided*, *however*, that no such amendment, waiver or consent shall: (i) reduce the principal amount of this Note without Investor's written consent other than prepayment as provided in Section 3 hereof, or (ii) reduce the rate of interest of this Note without Investor's written consent.

11. ***Transfer of this Note or Securities Issuable on Conversion Hereof by Investor.*** With respect to any offer, sale or other disposition of this Note or securities into which this Note may be converted, the Investor will give written notice to the Company prior thereto, describing briefly the manner thereof, together with a written opinion of the Investor's counsel, if requested by the Company, or other evidence reasonably satisfactory to the Company, to the effect that such offer, sale or other distribution may be effected without registration or qualification (under any federal or state law then in effect); *provided*, *however*, that no such restrictions shall apply and no such opinion shall be required in connection with the offer, sale or other disposition of this Note or securities into which this Note may be converted by the Investor to any Affiliate thereof. Upon receiving such written notice and reasonably satisfactory opinion, if so required and requested, or other evidence, the Company, as promptly as practicable, shall notify the Investor that the Investor may offer, sell or otherwise dispose of this Note or such securities, all in accordance with the terms of the notice delivered to the Company. If a determination has been made pursuant to this **Section 11** that the opinion of counsel for the Investor, or other evidence, is not reasonably satisfactory to the Company, the Company shall so notify the Investor promptly after such determination has been made and provide a detailed explanation of the basis for such determination. Each Note thus transferred and each certificate representing the securities thus transferred shall bear a legend as to the applicable restrictions on transferability in order to ensure compliance with the Securities Act and state securities laws, unless in the opinion of counsel for the Company such legend is not required in order to ensure compliance with the Securities Act or state securities laws. The Company may issue stop transfer instructions to its transfer agent in connection with such restrictions. Subject to the foregoing, transfers of this Note shall be registered upon registration books maintained for such purpose by or on behalf of the Company as provided herein and in the Note Purchase Agreement. Prior to presentation of this Note for registration of transfer, the Company shall treat the registered holder hereof as the owner and holder of this Note for the purpose of receiving all payments of principal and interest hereon and for all other purposes whatsoever, whether or not this Note shall be overdue and the Company shall not be affected by notice to the contrary. Notwithstanding the foregoing, the Investor may transfer all or any portion of this Note, or securities into which this Note may be converted, to any Affiliate without the prior approval of the Company or any opinion of the Investor's counsel, or other evidence required by the Company; *provided* that the Investor will give written notice to the Company following any such transfers. Any transferee or transferees of this Note of the securities into which this Note may be converted agree to assume the obligations of the holder of this Note as set forth herein, and shall be deemed to be the "Investor" for all purposes hereunder.

12. ***Assignment by the Company.*** Neither this Note nor any of the rights, interests or obligations hereunder may be assigned, by operation of law or otherwise, in whole or in part, by the Company without the prior written consent of the Investor unless all of the Notes are being assigned, in which case a the Notes may be assigned with the consent of a Majority in Interest of Investors.

13. ***Notices.*** All notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall be delivered in the manner required in the Note Purchase Agreement.

14. ***Payment.*** The Company will make all cash payments due under this Note in immediately available funds by 11:00 a.m. pacific time on the date such payment is due by means of wire transfer to such account as the Investor or other registered holder of a Note may from time to time direct in writing.

-6-

15. ***Usury.*** In the event any interest is paid on this Note that is deemed to be in excess of the then legal maximum rate, then that portion of the interest payment representing an amount in excess of the then legal maximum rate shall be deemed a payment of principal and applied against the principal of this Note.

16. ***Expenses; Waivers.***  If action is instituted to collect this Note, the Company agrees to pay all costs and expenses, including, without limitation, the Investor's reasonable attorneys' fees and costs, incurred in connection with such action.  The Company hereby waives notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor and all other notices or demands relative to this instrument.

17. ***Entire Agreement***. This Note together with the other Notes, the Note Purchase Agreement and each other agreement, schedule, exhibit, certificate or other document delivered in connection herewith and therewith constitute and contain the entire agreement among the Company and the Investor and supersede any and all prior agreements, negotiations, correspondence, understandings and communications among the parties, whether written or oral, respecting the subject matter hereof.

18. ***Governing Law.***  This Note and all actions arising out of or in connection with this Note shall be governed by and construed in accordance with the laws of the State of California, without regard to the conflicts of law provisions of the State of California, or of any other state.  All disputes and controversies arising out of or in connection with this Note shall be resolved exclusively by the state and federal courts located in Santa Clara County in the State of California, and each of the Company and the Investor hereby agrees to submit to the jurisdiction of said courts and agrees that venue shall lie exclusively with such courts.

*(Signature Page Follows)*

The Company has caused this Note to be issued as of the date first written above.

**NEPHOSCALE, INC.**, a California corporation

By: _____

Name and Title: Bruce Templeton, CEO

SV 347319283v4

# EXHIBIT C

On Apr 28, 2014, at 2:29 PM, Bruce Templeton <bruce@nephoscale.com> wrote:

Hi Scott,
It was great talking with you again, and thank you for taking the time to learn more about what we are working on at NephoScale.

Here is a rundown on the note:

- $7M cap (valuation).

- In the event there is a priced round of equity financing noteholders will have the option of converting to preferred stock at a $7M cap, or 20% discount, whichever is less.
- In the event of change of control (M&A) prior to maturity, or conversion, then noteholders will have the principal paid back as multiple of the $7M cap divided into the sale price of the company plus interest, or at a 3x multiple on the principal plus interest, whichever is more. In summary, if we get acquired prior to conversion then the noteholders will get the full 3x on their principal invested, as long as we sell the company for $3M or more. If we sell for more the $21M then their multiple rises above 3x.

We are at a negative cash flow run rate of about minus $30K/mo.-$50K/mo. - depending upon the month. We had it down to about $15K/mo. just about a month ago, but lost another $25K in the IP address rental revenue since then to only put us back where we were. I do think we can get back to breakeven in the next couple of months by tapping several potential sources of revenue. We do have a growing sales pipeline in place, outside of our work with HDS. The good news, if it can be considered such, is that there is little IP address revenue left to worry about losing. Over the past 12 months, we've gone from bringing in about $100k/mo. in IP address revenue to now about $10k/mo.. We have made up for the loss mostly through growing the cloud services revenue.

We are launching a new unique, and we think disruptive, SSD Virtual/SSD Dedicated w/ 10 Gbps solution at the end of this month. We call it ultra-performance Hybrid Compute. We think it will add significantly to customer traction and additional revenue over the remaining part of the year. There are several customers waiting for us to launch it so they can use it. The money to develop this new offering has already been spent on engineering and equipment, and the equipment needed for the infrastructure footprint required to launch has already been purchased. We have enough computing and storage capacity in place now to add about $50k/month in revenue in cloud services, without spending hardly a dime on equipment. We are very excited about this launch of the new Hybrid Compute solution at the end of this month.

Hitachi goes without saying, it is a big opportunity for the company in so many ways. The revenue from the HDS alone will help with grow NephoScale's revenue through added sales and marketing investment and it will accelerate the development of our intellectual property. It will also attract investors that have been on the sideline. Once this $1M note is filled out we will not be selling any more of the company at a $7M valuation. The valuation would be more like $20-30M if we did take in more money.

There is currently $436K left to fill on the note, and the sooner we can fill this out the better. We need to accelerate our efforts to grow the valuation in preparation for an acquisition or a series A round of financing. So far, we have been mostly in a defensive posture just building the platform out and making payroll. My goal is to get us to a point financially where we take a more offensive posture, and we think $200K now would do that. Once HDS has a written agreement in place with us (this should happen this week or next) we should be able to finish out the note rather quickly. The problem is that we

cannot take the chance to get too low on money and miss payroll for our engineering team. If the team splits up so they can go put food on their table, we've got trouble. There is also the morale issue, as they want more certainty in our financial situation, and my goal is to get that for them so they can stay focused on the tasks and opportunities at hand.

Whatever funds you are willing to allocate to this effort are appreciated. I'm extremely confident we are going to be successful, and that we are going to create an excellent return for our noteholders, and it will likely happen in a short period of time based upon what we built and what is happening in the market.

Best regards, Bruce


Bruce Templeton
CEO
NephoScale, Inc.
408-829-3949
www.nephoscale.com
Follow us on twitter @Nephoscale
<image002.png>

<NephoScale-Note Financing Term Sheet-04-25-14-FINAL.pdf><NephoScale-Note Purchase Agreement-12-23-13-FINAL.docx><Nephoscale-Unsecured Convertible Note_04-25-14-FINAL.docx>


**Scott Powell**
President


**Sacramento Jet Center**
*Safe.  Efficient. Accurate. Discreet.*
Sacramento International Airport (SMF)
Sacramento Mather Airport (MHR)
Sacramento Executive Airport (SAC)
6133 Freeport Boulevard
Sacramento, California 95822

Telephone: 916.428.8292
Fax: 916.428.3032
E-Mail: scott@sacjet.com
URL: http://www.sacjet.com

This message and any attachment are confidential and may be privileged or otherwise protected from disclosure. If you are not the intended recipient, please telephone or email the sender and delete this message and any attachment from your system. If you are not the intended recipient you must not copy this message or attachment or disclose the contents to any other person.

# EXHIBIT D

# NEPHOSCALE, INC.

## TERMS OF CONVERTIBLE PROMISSORY NOTES

April 25th, 2014

*This non-binding term sheet outlines the basic terms and conditions pursuant to which investors propose to proceed with discussions regarding making a bridge investment in NephoScale, Inc.. This term sheet is not intended to create a legally-binding agreement, but only to establish a foundation for negotiating a definitive agreement.*

The following sets forth for discussion purposes the terms of the unsecured, convertible promissory notes (the "bridge notes") in a principal amount of up to $1 million to be issued by NephoScale, Inc. to investors or their affiliates:

| | |
|---|---|
| Amount: | Up to $1 million, with each closing.  NephoScale, Inc. may continue to sell the bridge notes in one or more subsequent closings, until $1,000,000 of notes has been issued. |
| Term: | Payable at maturity on December 23, 2015, if not earlier converted as provided below, or if NephoScale, Inc. is not earlier acquired.  If the principal and interest on the bridge notes is not earlier converted, and NephoScale, Inc. has not been acquired by December 23, 2015, then the notes will mature and be payable at that time. |
| Interest Rate: | 7% simple annual interest, accruing.  All interest will be paid in an acquisition. At the election of the noteholder, all or a portion of any accrued interest can be converted into equity upon conversion. |
| Security: | Unsecured, general obligation of NephoScale, Inc.. |
| Conversion/Discount: | (1) In the event of a financing:  optional conversion upon election of the noteholder of any or all principal and interest into the class and series of Preferred Stock issued in the Company's next round of equity financing in which the proceeds received by the Company equal or exceed $500,000 (not including the amount of the note principal and interest converted), at a conversion price of the lower of: (i) 80% of the per share purchase price per share in the financing or (ii) the price per share determined at the time of the financing based upon a pre-money valuation of $7,000,000.  (2) In the event of an acquisition:  The outstanding note principal and interest will be paid in full promptly upon the closing of the acquisition, plus a premium of 200% of the outstanding note principal |

amount. If a Change of Control transaction results in net Proceeds payable, at the closing of the Change of Control transaction, to the Company or its stockholders, after transaction expenses and payment of the Company's outstanding debt, of more than $21 million, then for each $7 million dollars of net Change of Control transaction proceeds, or fraction thereof, in excess of $21 million, the Investor will receive an additional one times (or appropriate fraction thereof to correspond to the fraction of $7M referenced above) the principal amount of this Note.

No Prepayment:               The loan may not be prepaid without investors' written consent.

Miscellaneous:               California law will govern the this term sheet and the definitive agreement.  The forum for disputes will be exclusively California.  The issuance of the notes will be made pursuant to a note purchase agreement.  Any amendment or waiver of the notes will require the prior written consent of holders of at least a majority of the notes then outstanding and NephoScale, Inc..

*For discussion purposes only; no legally-binding agreement is created hereby.*

347218784

# EXHIBIT E

THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED OR THE SECURITIES LAWS OF ANY STATE. THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT AS TO THE SECURITIES UNDER SAID ACT OR LAWS OR AN OPINION OF COUNSEL OR OTHER EVIDENCE REASONABLY SATISFACTORY TO THE CORPORATION THAT SUCH REGISTRATION IS NOT REQUIRED.

NephoScale, Inc.

## CONVERTIBLE PROMISSORY NOTE

$100,000.00                 Issuance Date: April 29th, 2014                 CPN-A-14

FOR VALUE RECEIVED, NephoScale, Inc., a California corporation (the "**Company**") promises to pay to Scott L. Powell (the "**Investor**"), or its registered assigns, in lawful money of the United States of America the principal sum of one hundred thousand dollars ($100,000.00), or such lesser amount as shall equal the outstanding principal amount hereof, together with interest from the date of this Convertible Promissory Note (the "**Note**") on the unpaid principal balance at a rate equal to 7% per annum, computed on the basis of the actual number of days elapsed and a year of 365 days. To the extent not previously converted in accordance with **Section 6** hereof, all unpaid principal, together with any then unpaid and accrued interest and other amounts payable hereunder, shall be due and payable on the earlier of (i) December 23, 2015 (the "**Maturity Date**"), (ii) upon a Change of Control as defined and as set forth below, or (iii) when, upon or after the occurrence of an Event of Default (as defined below), such amounts are declared due and payable by the Investor or made automatically due and payable in accordance with the terms hereof. This Note is one of the "**Notes**" issued pursuant to a Note Purchase Agreement, as defined below.

The following is a statement of the rights of the Investor and the conditions to which this Note is subject, and to which the Investor, by the acceptance of this Note, agrees:

    1.  **Definitions**. As used in this Note, the following capitalized terms have the following meanings:

        (a)  "**Affiliate**" has the meaning ascribed to such term in Rule 405 promulgated under the Securities Act.

        (b)  "**Applicable Price Per Share**" shall mean an amount per share equal to the lesser of (i) 80% of the price per share paid by investors in the Qualified Equity Financing, or (ii) the price per share determined at the time of the Qualified Equity Financing based upon a pre-money valuation of $7,000,000.

        (c)  "**Change of Control**" shall mean: (i) the acquisition of the Company by another entity by means of any transaction or series of related transactions to which the Company is party (including, without limitation, any stock acquisition, reorganization, merger or consolidation but excluding any sale of stock for capital raising purposes) other than a transaction or series of transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction continue to retain (either by such voting securities remaining outstanding or by such voting securities being converted into voting securities of the surviving entity), as a result of shares in the Company held by such holders prior to such transaction, at least fifty percent (50%) of the total voting power represented by the voting securities of the Corporation or

least fifty percent (50%) of the total voting power represented by the voting securities of the Corporation or such surviving entity outstanding immediately after such transaction or series of transactions; or (ii) a sale, lease or other conveyance of all substantially all of the assets of the Company.

(d) The "Company" shall mean the corporation initially executing this Note and any person that succeeds to or assumes the obligations of the Company under this Note.

(e) "Event of Default" has the meaning given in **Section 4** hereof.

(f) "**Majority in Interest of Investors**" shall mean Investors holding more than 50% of the aggregate outstanding principal amount of the Notes.

(g) "**Note Purchase Agreement**" shall mean the Note Purchase Agreement, dated as of December 23, 2013 (as amended, modified or supplemented), by and among the Company and the Investors (as defined in the Note Purchase Agreement) party thereto.

(h) "**Obligations**" shall mean and include all loans, advances, debts, liabilities and obligations, howsoever arising, owed by the Company to the Investor of every kind and description (whether or not evidenced by any note or instrument and whether or not for the payment of money), now existing or hereafter arising under or pursuant to the terms of this Note, each of the other Notes, the Note Purchase Agreement and each other agreement, schedule, exhibit, certificate or other document delivered in connection herewith and therewith, including all interest, fees, charges, expenses, attorneys' fees and costs and accountants' fees and costs chargeable to and payable by the Company hereunder and thereunder, in each case, whether direct or indirect, absolute or contingent, due or to become due, and whether or not arising after the commencement of a proceeding under Title 11 of the United States Code (11 U. S. C. Section 101 et seq.), as amended from time to time (including post-petition interest) and whether or not allowed or allowable as a claim in any such proceeding.

(i) "**Preferred Stock**" shall mean a series of Preferred Stock of the Company.

(j) "**Qualified Equity Financing**" shall mean a bona fide equity financing, with the principal purpose of raising capital, pursuant to which the Company sells shares of a series of Preferred Stock with aggregate gross proceeds to the Company of not less than $500,000, excluding any and all notes which are converted into Preferred Stock (including this Note and the other Notes, if any, issued under the Note Purchase Agreement).

(k) "**Securities Act**" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

(l) "**Senior Indebtedness**" shall mean, unless expressly subordinated to or made on a parity with the amounts due under this Note, the principal of (and premium, if any), unpaid interest on and amounts reimbursable, fees, expenses, costs of enforcement and other amounts due in connection with, (i) indebtedness for borrowed money of the Company, to banks, commercial finance lenders or other lending institutions regularly engaged in the business of lending money (excluding (A) any indebtedness convertible into equity securities of the Company and (B) indebtedness in connection with capital leases or operating leases used solely for the purchase, finance or acquisition of equipment and where such indebtedness is secured solely by such equipment), and (ii) any extension, refinance, renewal, replacement, defeasance or refunding of any indebtedness described in clause (i).

-2-

2.  *Interest.* Accrued interest on this Note shall be payable at maturity, upon a Change of Control, and in a Qualified Financing at the election of the holder hereof.

3.  *Prepayment.* This Note may not be prepaid without the consent of a Majority in Interest of Investors. Any prepayment must be paid pro rata to all Investors based on the principal amount of the Notes.

4.  *Events of Default.* The occurrence of any of the following shall constitute an "**Event of Default**" under this Note and the Note Purchase Agreement:

(a) *Failure to Pay.* The Company shall fail to pay (i) when due any principal or interest payment on the due date hereunder or (ii) any other payment required under the terms of this Note or any other Transaction Document on the date due and such payment shall not have been made within ten (10) days of the Company's receipt of the Investor's written notice to the Company of such failure to pay; or

(b) *Breaches of Covenants.* The Company or any of its Subsidiaries shall fail to observe or perform any other covenant, obligation, condition or agreement contained in this Note, the other Notes, the Note Purchase Agreement or any other agreement, schedule, exhibit, certificate or other document delivered in connection herewith and therewith (other than those specified in **Section 4(a)** above) and such failure shall continue for ten (10) days; or

(c) *Representations and Warranties.* Any representation, warranty, certificate, or other statement (financial or otherwise) made or furnished by or on behalf of the Company to the Investor in writing in connection with any Transaction Document, or as an inducement to the Investor to enter into any Transaction Document, shall be false, incorrect, incomplete or misleading in any material respect when made or furnished; or

(d) *Voluntary Bankruptcy or Insolvency Proceedings.* The Company or any of its Subsidiaries shall (i) apply for or consent to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, (ii) be unable, or admit in writing its inability, to pay its debts generally as they mature, (iii) make a general assignment for the benefit of its or any of its creditors, (iv) be dissolved or liquidated, (v) become insolvent (as such term may be defined or interpreted under any applicable statute), (vi) commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it, or (vii) take any action for the purpose of effecting any of the foregoing; or

(e) *Involuntary Bankruptcy or Insolvency Proceedings.* Proceedings for the appointment of a receiver, trustee, liquidator or custodian of the Company or any of its Subsidiaries or of all or a substantial part of the property thereof, or an involuntary case or other proceedings seeking liquidation, reorganization or other relief with respect to the Company or any of its Subsidiaries or the debts thereof under any bankruptcy, insolvency, or other similar law now or hereafter in effect shall be commenced and an order for relief entered or such proceeding shall not be dismissed or discharged within 30 days of commencement; or

(f) *Material Terms.* Either this Note or the Note Purchase Agreement or any material term thereof shall cease to be, or be asserted by the Company not to be, a legal, valid and binding obligation of the Company enforceable in accordance with its terms.

SV\3473\938324



5. **Rights of the Investor upon Default** Upon the occurrence or existence of any Event of Default (other than an Event of Default described in Sections 4(d) or 4(e)) and at any time thereafter during the continuance of such Event of Default. the Investor may, with the written consent of a Majority in Interest of Investors by written notice to the Company, declare all outstanding Obligations payable by the Company hereunder to be immediately due and payable without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived, notwithstanding anything to the contrary contained in any Transaction Document. Upon the occurrence or existence of any Event of Default described in Sections 4(d) or 4(e), immediately and without notice, all outstanding Obligations payable by the Company hereunder shall automatically become immediately due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived, notwithstanding anything to the contrary contained in any Transaction Document. In addition to the foregoing remedies, upon the occurrence or existence of any Event of Default, the Investor may, with the written consent of a Majority in Interest of Investors, exercise any other right power or remedy granted to it by any Transaction Document or otherwise permitted to it by law, either by suit in equity or by action at law, or both. The Investor shall have a full right of offset for any amounts due upon such a default against any amounts payable by the Investor to the Company.

6. **Conversion; Payment upon a Change of Control.**

(a) *Conversion.* In the event that, prior to the Maturity Date, the Company consummates a Qualified Equity Financing, then the Investor may elect to convert the outstanding principal amount due under this Note plus all accrued interest into shares of the Preferred Stock issued in the Qualified Equity Financing at the Applicable Price Per Share and otherwise on the same terms (including the same rights, preferences and privileges) as the other investors that purchase shares of Preferred Stock in the Qualified Equity Financing. Upon such conversion of this Note, the investor hereby agrees to execute and deliver to the Company all transaction documents related to the Qualified Equity Financing, including a purchase agreement and other ancillary agreements, with customary representations and warranties and transfer restrictions (including a 180-day lock-up agreement in connection with an initial public offering), and having the same terms as those agreements entered into by the other purchasers of the Preferred Stock in the Qualified Equity Financing. If the Investor elects to convert all or any portion of the principal or interest due under the Note, the Investor also agrees to deliver the original of this Note at the closing of the Qualified Equity Financing for cancellation; *provided, however,* that upon satisfaction of the conditions set forth in this Section 6(a), this Note shall be deemed converted and of no further force and effect, whether or not it is delivered for cancellation as set forth in this sentence. If the Investor elects to not convert all or any portion of the Note principal and interest into the equity issued in the Qualified Equity Financing, then any portion of the principal and interest not converted will be paid to the Investor at the closing of the Qualified Equity Financing.

(b) *Payment Upon a Change of Control.* If the Company shall have a Change of Control at any time while this Note remains outstanding the Company shall pay the Investor an amount equal to the sum of (i) the outstanding principal amount of the Note, plus (ii) an additional two times the outstanding principal on the Note at the time of the consummation of the Change of Control transaction, plus (iii) all accrued interest. In addition, if the Change of Control transaction results in net proceeds payable, at the closing of the Change of Control transaction, to the Company or its stockholders, after transaction expenses and payment of the Company's outstanding debt, of more than $21 million, then for each $7 million dollars of net Change of Control transaction proceeds, or fraction thereof, in excess of $21 million, the Investor will receive an additional one times (or appropriate fraction thereof to correspond to the fraction of $7M referenced above) the principal amount of this Note. The Investor agrees to deliver the original of this Note at the closing of the Change of Control for cancellation, *provided, however,* that upon satisfaction of the conditions set forth in

-4-



this **Section 6(b)**, this Note shall be deemed converted and of no further force and effect, whether or not it is delivered for cancellation as set forth in this sentence.

(c) *Fractional Shares; Interest; Effect of Conversion; Lost Notes.* No fractional shares shall be issued upon conversion of this Note. In lieu of the Company issuing any fractional shares to the Investor upon the conversion of this Note, the Company shall pay to the Investor in cash that amount of the unconverted principal and interest balance of this Note. In addition, the Company shall pay to the Investor any interest accrued on the amount converted and on the amount to be paid to the Company pursuant to the previous sentence. The issuance of any certificate or certificates upon conversion of this Note in accordance with **Section 6** shall be made without charge to the Investor for any tax or charge with respect to the issuance thereof. Upon conversion of this Note in full and the payment of any amounts specified in this **Section 6(c)**, the Company shall be forever released from all its obligations and liabilities under this Note. If the original Note has been lost, stolen or destroyed, in lieu of delivering the original Note to the Company pursuant to **Sections 6(a)** through **6(b)** above, the Investor shall deliver notice thereof to the Company, evidence reasonably satisfactory to the Company of the ownership of and the loss, theft, destruction or mutilation of this Note and an agreement acceptable to the Company whereby the holder agrees to indemnify the Company from any loss incurred by it in connection with the lost, stolen, destroyed or mutilated Note.

7.   *No Subordination for Future Indebtedness.* The Obligations evidenced by this Note are hereby expressly subordinated in right of payment to the prior payment in full of all of the Company's currently existing Senior Indebtedness and any related liens thereto. The Company covenants and agrees that it will incur no new Senior Indebtedness without the consent of a Majority in Interest of Investors. With respect to Senior Indebtedness existing on the date hereof, by acceptance of this Note, Investor agrees to execute and deliver customary forms of subordination agreement requested from time to time by holders of such Senior Indebtedness, and as a condition to Investor's rights hereunder, the Company may require that Investor execute such forms of subordination agreement. Notwithstanding the foregoing, Investor shall be entitled to receive (i) equity securities of the Company from the conversion of all or any part of the Obligations and payments of cash in lieu of issuing fractional shares in connection with any such conversions, (ii) any note, instrument or other evidence of indebtedness which may be issued by the Company in exchange for or in substitution of this Note, provided that such note, instrument or other evidence of indebtedness is subordinated to the Senior Indebtedness outstanding as of the date of this Agreement on the same terms and conditions as set forth in this **Section 7** and (iii) other payments consented to in writing by holders of such Senior Indebtedness.

8.   *Pari Passu Notes.* Investor acknowledges and agrees that the payment of all or any portion of the outstanding principal amount of this Note and all interest hereon shall be pari passu in right of payment and in all other respects to the other Notes and any other indebtedness of the Company convertible into equity securities of the Company, unless expressly subordinated to the amounts due under this Note. In the event Investor receives payments in excess of its pro rata share of the Company's payments to the Investors of all of the Notes and any other indebtedness of the Company convertible into equity securities of the Company, unless expressly subordinated to the amounts due under this Note, then Investor shall hold in trust all such excess payments for the benefit of the holders of the other securities and shall pay such amounts held in trust to such other holders upon demand by such holders.

9.   *Successors and Assigns.* Subject to the restrictions on transfer described in **Sections 11** and **12** below, the rights and obligations of the Company and the Investor shall be binding upon and benefit the successors, assigns, heirs, administrators and transferees of the parties.

-5-

10.  *Waiver and Amendment.*  Any provision of this Note may be amended, waived or modified upon the written consent of the Company and a Majority in Interest of Investors: *provided, however,* that no such amendment, waiver or consent shall: (i) reduce the principal amount of this Note without Investor's written consent other than prepayment as provided in Section 3 hereof, or (ii) reduce the rate of interest of this Note without Investor's written consent.

11.  *Transfer of this Note or Securities Issuable on Conversion Hereof by Investor.*  With respect to any offer, sale or other disposition of this Note or securities into which this Note may be converted, the Investor will give written notice to the Company prior thereto, describing briefly the manner thereof, together with a written opinion of the Investor's counsel, if requested by the Company, or other evidence reasonably satisfactory to the Company, to the effect that such offer, sale or other distribution may be effected without registration or qualification (under any federal or state law then in effect); *provided, however,* that no such restrictions shall apply and no such opinion shall be required in connection with the offer, sale or other disposition of this Note or securities into which this Note may be converted by the Investor to any Affiliate thereof. Upon receiving such written notice and reasonably satisfactory opinion, if so required and requested, or other evidence, the Company, as promptly as practicable, shall notify the Investor that the Investor may offer, sell or otherwise dispose of this Note or such securities, all in accordance with the terms of the notice delivered to the Company. If a determination has been made pursuant to this **Section 11** that the opinion of counsel for the Investor, or other evidence, is not reasonably satisfactory to the Company, the Company shall so notify the Investor promptly after such determination has been made and provide a detailed explanation of the basis for such determination. Each Note thus transferred and each certificate representing the securities thus transferred shall bear a legend as to the applicable restrictions on transferability in order to ensure compliance with the Securities Act and state securities laws, unless in the opinion of counsel for the Company such legend is not required in order to ensure compliance with the Securities Act or state securities laws. The Company may issue stop transfer instructions to its transfer agent in connection with such restrictions. Subject to the foregoing, transfers of this Note shall be registered upon registration books maintained for such purpose by or on behalf of the Company as provided herein and in the Note Purchase Agreement. Prior to presentation of this Note for registration of transfer, the Company shall treat the registered holder hereof as the owner and holder of this Note for the purpose of receiving all payments of principal and interest hereon and for all other purposes whatsoever, whether or not this Note shall be overdue and the Company shall not be affected by notice to the contrary. Notwithstanding the foregoing, the Investor may transfer all or any portion of this Note, or securities into which this Note may be converted, to any Affiliate without the prior approval of the Company or any opinion of the Investor's counsel, or other evidence required by the Company; *provided* that the Investor will give written notice to the Company following any such transfers. Any transferee or transferees of this Note or the securities into which this Note may be converted agree to assume the obligations of the holder of this Note as set forth herein, and shall be deemed to be the "Investor" for all purposes hereunder.

12.  *Assignment by the Company.*  Neither this Note nor any of the rights, interests or obligations hereunder may be assigned, by operation of law or otherwise, in whole or in part, by the Company without the prior written consent of the Investor unless all of the Notes are being assigned, in which case a the Notes may be assigned with the consent of a Majority in Interest of Investors.

13.  *Notices.*  All notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall be delivered in the manner required in the Note Purchase Agreement.

14.  *Payment.*  The Company will make all cash payments due under this Note in immediately available funds by 11:00 a.m. pacific time on the date such payment is due by means of wire transfer to such account as the Investor or other registered holder of a Note may from time to time direct in writing.

SV 347319283v8



15. *Usury.* In the event any interest is paid on this Note that is deemed to be in excess of the then legal maximum rate, then that portion of the interest payment representing an amount in excess of the then legal maximum rate shall be deemed a payment of principal and applied against the principal of this Note.

16. *Expenses; Waivers.* If action is instituted to collect this Note, the Company agrees to pay all costs and expenses, including, without limitation, the Investor's reasonable attorneys' fees and costs, incurred in connection with such action. The Company hereby waives notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor and all other notices or demands relative to this instrument.

17. *Entire Agreement.* This Note together with the other Notes, the Note Purchase Agreement and each other agreement, schedule, exhibit, certificate or other document delivered in connection herewith and therewith constitute and contain the entire agreement among the Company and the Investor and supersede any and all prior agreements, negotiations, correspondence, understandings and communications among the parties, whether written or oral, respecting the subject matter hereof.

18. *Governing Law.* This Note and all actions arising out of or in connection with this Note shall be governed by and construed in accordance with the laws of the State of California, without regard to the conflicts of law provisions of the State of California, or of any other state.  All disputes and controversies arising out of or in connection with this Note shall be resolved exclusively by the state and federal courts located in Santa Clara County in the State of California, and each of the Company and the Investor hereby agrees to submit to the jurisdiction of said courts and agrees that venue shall lie exclusively with such courts.

*(Signature Page Follows)*

-7-



The Company has caused this Note to be issued as of the date first written above.

NEPHROSCALE, INC., a California corporation

By: _____

Name and Title: Bruce Templeton, CEO

(Signature Page to Convertible Promissory Note)

# EXHIBIT F

**THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED OR THE SECURITIES LAWS OF ANY STATE. THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT AS TO THE SECURITIES UNDER SAID ACT OR LAWS OR AN OPINION OF COUNSEL OR OTHER EVIDENCE REASONABLY SATISFACTORY TO THE CORPORATION THAT SUCH REGISTRATION IS NOT REQUIRED.**

NephoScale, Inc.

## CONVERTIBLE PROMISSORY NOTE

$10,000.00                     Issuance Date: December 08, 2014                     CPN-B-2

FOR VALUE RECEIVED, NephoScale, Inc., a California corporation (the "**Company**") promises to pay to John Mills (the "**Investor**"), or its registered assigns, in lawful money of the United States of America the principal sum of ten thousand dollars [$10,000.00], or such lesser amount as shall equal the outstanding principal amount hereof, together with interest from the date of this Convertible Promissory Note (the "**Note**") on the unpaid principal balance at a rate equal to 7% per annum, computed on the basis of the actual number of days elapsed and a year of 365 days. To the extent not previously converted in accordance with **Section** 6 hereof, all unpaid principal, together with any then unpaid and accrued interest and other amounts payable hereunder, shall be due and payable on the earlier of (i) December 08, 2016 (the "**Maturity Date**"), (ii) upon a Change of Control as defined and as set forth below, or (iii) when, upon or after the occurrence of an Event of Default (as defined below), such amounts are declared due and payable by the Investor or made automatically due and payable in accordance with the terms hereof. This Note is one of the "Notes" issued pursuant to a Note Purchase Agreement, as defined below.

The following is a statement of the rights of the Investor and the conditions to which this Note is subject, and to which the Investor, by the acceptance of this Note, agrees:

1. ***Definitions***. As used in this Note, the following capitalized terms have the following meanings:

(a) "**Affiliate**" has the meaning ascribed to such term in Rule 405 promulgated under the Securities Act.

(b) "**Applicable Price Per Share**" shall mean an amount per share equal to the lesser of (i) 80% of the price per share paid by investors in the Qualified Equity Financing, or (ii) the price per share determined at the time of the Qualified Equity Financing based upon a pre-money valuation of $7,000,000.

(c) "**Change of Control**" shall mean: (i) the acquisition of the Company by another entity by means of any transaction or series of related transactions to which the Company is party (including, without limitation, any stock acquisition, reorganization, merger or consolidation but excluding any sale of stock for capital raising purposes) other than a transaction or series of transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction continue to retain (either by such voting securities remaining outstanding or by such voting securities being converted into voting securities of the surviving entity), as a result of shares in the Company held by such holders prior to such transaction, at

least fifty percent (50%) of the total voting power represented by the voting securities of the Corporation or such surviving entity outstanding immediately after such transaction or series of transactions; or (ii) a sale, lease or other conveyance of all substantially all of the assets of the Company.

(d)  The "**Company**" shall mean the corporation initially executing this Note and any person that succeeds to or assumes the obligations of the Company under this Note.

(e)  "**Event of Default**" has the meaning given in **Section** 4 hereof.

(f)  "**Majority in Interest of Investors**" shall mean Investors holding more than 50% of the aggregate outstanding principal amount of the Notes.

(g)  "**Note Purchase Agreement**" shall mean the Note Purchase Agreement, dated as of December 23, 2013 (as amended, modified or supplemented), by and among the Company and the Investors (as defined in the Note Purchase Agreement) party thereto.

(h)  "**Obligations**" shall mean and include all loans, advances, debts, liabilities and obligations, howsoever arising, owed by the Company to the Investor of every kind and description (whether or not evidenced by any note or instrument and whether or not for the payment of money), now existing or hereafter arising under or pursuant to the terms of this Note, each of the other Notes, the Note Purchase Agreement and each other agreement, schedule, exhibit, certificate or other document delivered in connection herewith and therewith, including, all interest, fees, charges, expenses, attorneys' fees and costs and accountants' fees and costs chargeable to and payable by the Company hereunder and thereunder, in each case, whether direct or indirect, absolute or contingent, due or to become due, and whether or not arising after the commencement of a proceeding under Title 11 of the United States Code (11 U. S. C. Section 101 *et seq*.), as amended from time to time (including post-petition interest) and whether or not allowed or allowable as a claim in any such proceeding.

(i)  "**Preferred Stock**" shall mean a series of Preferred Stock of the Company.

(j)  "**Qualified Equity Financing**" shall mean a bona fide equity financing, with the principal purpose of raising capital, pursuant to which the Company sells shares of a series of Preferred Stock with aggregate gross proceeds to the Company of not less than $500,000, excluding any and all notes which are converted into Preferred Stock (including this Note and the other Notes, if any, issued under the Note Purchase Agreement).

(k)  "**Securities Act**" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

(l)  "**Senior Indebtedness**" shall mean, unless expressly subordinated to or made on a parity with the amounts due under this Note, the principal of (and premium, if any), unpaid interest on and amounts reimbursable, fees, expenses, costs of enforcement and other amounts due in connection with, (i) indebtedness for borrowed money of the Company, to banks, commercial finance lenders or other lending institutions regularly engaged in the business of lending money (excluding (A) any indebtedness convertible into equity securities of the Company and (B) indebtedness in connection with capital leases or operating leases used solely for the purchase, finance or acquisition of equipment and where such indebtedness is secured solely by such equipment), and (ii) any extension, refinance, renewal, replacement, defeasance or refunding of any indebtedness described in clause (i).

-2-

2.  **_Interest_**.  Accrued interest on this Note shall be payable at maturity, upon a Change of Control, and in a Qualified Financing at the election of the holder hereof.

3.  **_Prepayment_**.  This Note may not be prepaid without the consent of a Majority in Interest of Investors. Any prepayment must be paid pro rata to all Investors based on the principal amount of the Notes.

4.  **_Events of Default_**. The occurrence of any of the following shall constitute an "**Event of Default**" under this Note and the Note Purchase Agreement:

(a)  _Failure to Pay_.  The Company shall fail to pay (i) when due any principal or interest payment on the due date hereunder or (ii) any other payment required under the terms of this Note or any other Transaction Document on the date due and such payment shall not have been made within ten (10) days of the Company's receipt of the Investor's written notice to the Company of such failure to pay; or

(b)  _Breaches of Covenants_. The Company or any of its Subsidiaries shall fail to observe or perform any other covenant, obligation, condition or agreement contained in this Note, the other Notes, the Note Purchase Agreement or any other agreement, schedule, exhibit, certificate or other document delivered in connection herewith and therewith (other than those specified in **Section 4(a)** above) and such failure shall continue for ten (10) days; or

(c)  _Representations and Warranties_. Any representation, warranty, certificate, or other statement (financial or otherwise) made or furnished by or on behalf of the Company to the Investor in writing in connection with any Transaction Document, or as an inducement to the Investor to enter into any Transaction Document, shall be false, incorrect, incomplete or misleading in any material respect when made or furnished; or

(d)  _Voluntary Bankruptcy or Insolvency Proceedings_. The Company or any of its Subsidiaries shall (i) apply for or consent to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, (ii) be unable, or admit in writing its inability, to pay its debts generally as they mature, (iii) make a general assignment for the benefit of its or any of its creditors, (iv) be dissolved or liquidated, (v) become insolvent (as such term may be defined or interpreted under any applicable statute), (vi) commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it, or (vii) take any action for the purpose of effecting any of the foregoing; or

(e)  _Involuntary Bankruptcy or Insolvency Proceedings_. Proceedings for the appointment of a receiver, trustee, liquidator or custodian of the Company or any of its Subsidiaries or of all or a substantial part of the property thereof, or an involuntary case or other proceedings seeking liquidation, reorganization or other relief with respect to the Company or any of its Subsidiaries or the debts thereof under any bankruptcy, insolvency or other similar law now or hereafter in effect shall be commenced and an order for relief entered or such proceeding shall not be dismissed or discharged within 30 days of commencement; or

(f)  _Material Terms_. Either this Note or the Note Purchase Agreement or any material term thereof shall cease to be, or be asserted by the Company not to be, a legal, valid and binding obligation of the Company enforceable in accordance with its terms.

5.  *Rights of the Investor upon Default*. Upon the occurrence or existence of any Event of Default (other than an Event of Default described in **Sections 4(d)** or **4(e)**) and at any time thereafter during the continuance of such Event of Default, the Investor may, with the written consent of a Majority in Interest of Investors, by written notice to the Company, declare all outstanding Obligations payable by the Company hereunder to be immediately due and payable without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived, notwithstanding anything to the contrary contained in any Transaction Document.  Upon the occurrence or existence of any Event of Default described in **Sections 4(d)** or **4(e)**, immediately and without notice, all outstanding Obligations payable by the Company hereunder shall automatically become immediately due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived, notwithstanding anything to the contrary contained in any Transaction Document.  In addition to the foregoing remedies, upon the occurrence or existence of any Event of Default, the Investor may, with the written consent of a Majority in Interest of Investors, exercise any other right power or remedy granted to it by any Transaction Document or otherwise permitted to it by law, either by suit in equity or by action at law, or both.  The Investor shall have a full right of offset for any amounts due upon such a default against any amounts payable by the Investor to the Company.

6.  *Conversion; Payment upon a Change of Control.*

(a)  *Conversion.*  In the event that, prior to the Maturity Date, the Company consummates a Qualified Equity Financing, then the Investor may elect to convert the outstanding principal amount due under this Note plus all accrued interest into shares of the Preferred Stock issued in the Qualified Equity Financing at the Applicable Price Per Share and otherwise on the same terms (including the same rights, preferences and privileges) as the other investors that purchase shares of Preferred Stock in the Qualified Equity Financing.  Upon such conversion of this Note, the Investor hereby agrees to execute and deliver to the Company all transaction documents related to the Qualified Equity Financing, including a purchase agreement and other ancillary agreements, with customary representations and warranties and transfer restrictions (including a 180-day lock-up agreement in connection with an initial public offering), and having the same terms as those agreements entered into by the other purchasers of the Preferred Stock in the Qualified Equity Financing.  If the Investor elects to convert all or any portion of the principal or interest due under the Note, the Investor also agrees to deliver the original of this Note at the closing of the Qualified Equity Financing for cancellation; *provided, however*, that upon satisfaction of the conditions set forth in this **Section 6(a)**, this Note shall be deemed converted and of no further force and effect, whether or not it is delivered for cancellation as set forth in this sentence.  If the Investor elects to not convert all or any portion of the Note principal and interest into the equity issued in the Qualified Equity Financing, then any portion of the principal and interest not converted will be paid to the Investor at the closing of the Qualified Equity Financing.

(b)  *Payment Upon a Change of Control.*  If the Company shall have a Change of Control at any time while this Note remains outstanding the Company shall pay the Investor an amount equal to the sum of (i) the outstanding principal amount of the Note, plus (ii) an additional two times the outstanding principal on the Note at the time of the consummation of the Change of Control transaction, plus (iii) all accrued interest.  In addition, if the Change of Control transaction results in net proceeds payable, at the closing of the Change of Control transaction, to the Company or its stockholders, after transaction expenses and payment of the Company's outstanding debt, of more than $21 million, then for each $7 million dollars of net Change of Control transaction proceeds, or fraction thereof, in excess of $21 million, the Investor will receive an additional one times (or appropriate fraction thereof to correspond to the fraction of $7M referenced above) the principal amount of this Note. The Investor agrees to deliver the original of this Note at the closing of the Change of Control for cancellation; *provided, however*, that upon satisfaction of the conditions set forth in

-4-

this **Section 6(b)**, this Note shall be deemed converted and of no further force and effect, whether or not it is delivered for cancellation as set forth in this sentence.

(c) *Fractional Shares; Interest; Effect of Conversion; Lost Notes.* No fractional shares shall be issued upon conversion of this Note. In lieu of the Company issuing any fractional shares to the Investor upon the conversion of this Note, the Company shall pay to the Investor in cash that amount of the unconverted principal and interest balance of this Note. In addition, the Company shall pay to the Investor any interest accrued on the amount converted and on the amount to be paid to the Company pursuant to the previous sentence. The issuance of any certificate or certificates upon conversion of this Note in accordance with **Section 6** shall be made without charge to the Investor for any tax or charge with respect to the issuance thereof. Upon conversion of this Note in full and the payment of any amounts specified in this **Section 6(c)**, the Company shall be forever released from all its obligations and liabilities under this Note. If the original Note has been lost, stolen or destroyed, in lieu of delivering the original Note to the Company pursuant to **Sections 6(a)** through **6(b)** above, the Investor shall deliver notice thereof to the Company, evidence reasonably satisfactory to the Company of the ownership of and the loss, theft, destruction or mutilation of this Note and an agreement acceptable to the Company whereby the holder agrees to indemnify the Company from any loss incurred by it in connection with the lost, stolen, destroyed or mutilated Note.

7.   *No Subordination for Future Indebtedness.* The Obligations evidenced by this Note are hereby expressly subordinated in right of payment to the prior payment in full of all of the Company's currently existing Senior Indebtedness and any related liens thereto. The Company covenants and agrees that it will incur no new Senior Indebtedness without the consent of a Majority in Interest of Investors. With respect to Senior Indebtedness existing on the date hereof, by acceptance of this Note, Investor agrees to execute and deliver customary forms of subordination agreement requested from time to time by holders of such Senior Indebtedness, and as a condition to Investor's rights hereunder, the Company may require that Investor execute such forms of subordination agreement. Notwithstanding the foregoing, Investor shall be entitled to receive (i) equity securities of the Company from the conversion of all or any part of the Obligations and payments of cash in lieu of issuing fractional shares in connection with any such conversions, (ii) any note, instrument or other evidence of indebtedness which may be issued by the Company in exchange for or in substitution of this Note, provided that such note, instrument or other evidence of indebtedness is subordinated to the Senior Indebtedness outstanding as of the date of this Agreement on the same terms and conditions as set forth in this **Section** 7 and (iii) other payments consented to in writing by holders of such Senior Indebtedness.

8.   *Pari Passu Notes.* Investor acknowledges and agrees that the payment of all or any portion of the outstanding principal amount of this Note and all interest hereon shall be pari passu in right of payment and in all other respects to the other Notes and any other indebtedness of the Company convertible into equity securities of the Company, unless expressly subordinated to the amounts due under this Note. In the event Investor receives payments in excess of its pro rata share of the Company's payments to the Investors of all of the Notes and any other indebtedness of the Company convertible into equity securities of the Company, unless expressly subordinated to the amounts due under this Note, then Investor shall hold in trust all such excess payments for the benefit of the holders of the other securities and shall pay such amounts held in trust to such other holders upon demand by such holders.

9.   *Successors and Assigns.* Subject to the restrictions on transfer described in **Sections 11** and **12** below, the rights and obligations of the Company and the Investor shall be binding upon and benefit the successors, assigns, heirs, administrators and transferees of the parties.

-5-

10. ***Waiver and Amendment.*** Any provision of this Note may be amended, waived or modified upon the written consent of the Company and a Majority in Interest of Investors; *provided, however,* that no such amendment, waiver or consent shall: (i) reduce the principal amount of this Note without Investor's written consent other than prepayment as provided in Section 3 hereof, or (ii) reduce the rate of interest of this Note without Investor's written consent.

11. ***Transfer of this Note or Securities Issuable on Conversion Hereof by Investor.*** With respect to any offer, sale or other disposition of this Note or securities into which this Note may be converted, the Investor will give written notice to the Company prior thereto, describing briefly the manner thereof, together with a written opinion of the Investor's counsel, if requested by the Company, or other evidence reasonably satisfactory to the Company, to the effect that such offer, sale or other distribution may be effected without registration or qualification (under any federal or state law then in effect); *provided, however,* that no such restrictions shall apply and no such opinion shall be required in connection with the offer, sale or other disposition of this Note or securities into which this Note may be converted by the Investor to any Affiliate thereof. Upon receiving such written notice and reasonably satisfactory opinion, if so required and requested, or other evidence, the Company, as promptly as practicable, shall notify the Investor that the Investor may offer, sell or otherwise dispose of this Note or such securities, all in accordance with the terms of the notice delivered to the Company. If a determination has been made pursuant to this **Section 11** that the opinion of counsel for the Investor, or other evidence, is not reasonably satisfactory to the Company, the Company shall so notify the Investor promptly after such determination has been made and provide a detailed explanation of the basis for such determination. Each Note thus transferred and each certificate representing the securities thus transferred shall bear a legend as to the applicable restrictions on transferability in order to ensure compliance with the Securities Act and state securities laws, unless in the opinion of counsel for the Company such legend is not required in order to ensure compliance with the Securities Act or state securities laws. The Company may issue stop transfer instructions to its transfer agent in connection with such restrictions. Subject to the foregoing, transfers of this Note shall be registered upon registration books maintained for such purpose by or on behalf of the Company as provided herein and in the Note Purchase Agreement. Prior to presentation of this Note for registration of transfer, the Company shall treat the registered holder hereof as the owner and holder of this Note for the purpose of receiving all payments of principal and interest hereon and for all other purposes whatsoever, whether or not this Note shall be overdue and the Company shall not be affected by notice to the contrary. Notwithstanding the foregoing, the Investor may transfer all or any portion of this Note, or securities into which this Note may be converted, to any Affiliate without the prior approval of the Company or any opinion of the Investor's counsel, or other evidence required by the Company; *provided* that the Investor will give written notice to the Company following any such transfers. Any transferee or transferees of this Note of the securities into which this Note may be converted agree to assume the obligations of the holder of this Note as set forth herein, and shall be deemed to be the "Investor" for all purposes hereunder.

12. ***Assignment by the Company.*** Neither this Note nor any of the rights, interests or obligations hereunder may be assigned, by operation of law or otherwise, in whole or in part, by the Company without the prior written consent of the Investor unless all of the Notes are being assigned, in which case a the Notes may be assigned with the consent of a Majority in Interest of Investors.

13. ***Notices.*** All notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall be delivered in the manner required in the Note Purchase Agreement.

14. ***Payment.*** The Company will make all cash payments due under this Note in immediately available funds by 11:00 a.m. pacific time on the date such payment is due by means of wire transfer to such account as the Investor or other registered holder of a Note may from time to time direct in writing.

-6-

15. ***Usury.*** In the event any interest is paid on this Note that is deemed to be in excess of the then legal maximum rate, then that portion of the interest payment representing an amount in excess of the then legal maximum rate shall be deemed a payment of principal and applied against the principal of this Note.

16. ***Expenses; Waivers.*** If action is instituted to collect this Note, the Company agrees to pay all costs and expenses, including, without limitation, the Investor's reasonable attorneys' fees and costs, incurred in connection with such action. The Company hereby waives notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor and all other notices or demands relative to this instrument.

17. ***Entire Agreement***. This Note together with the other Notes, the Note Purchase Agreement and each other agreement, schedule, exhibit, certificate or other document delivered in connection herewith and therewith constitute and contain the entire agreement among the Company and the Investor and supersede any and all prior agreements, negotiations, correspondence, understandings and communications among the parties, whether written or oral, respecting the subject matter hereof.

18. ***Governing Law.*** This Note and all actions arising out of or in connection with this Note shall be governed by and construed in accordance with the laws of the State of California, without regard to the conflicts of law provisions of the State of California, or of any other state. All disputes and controversies arising out of or in connection with this Note shall be resolved exclusively by the state and federal courts located in Santa Clara County in the State of California, and each of the Company and the Investor hereby agrees to submit to the jurisdiction of said courts and agrees that venue shall lie exclusively with such courts.

(<em>Signature Page Follows</em>)

The Company has caused this Note to be issued as of the date first written above.

**NEPHOSCALE, INC.**, a California corporation

By: _____

Name and Title: Bruce Templeton, CEO

**[Signature Page to Convertible Promissory Note]**

# EXHIBIT G

**From:** Bruce Templeton [mailto:bruce@nephoscale.com]
**Sent:** Tuesday, September 29, 2015 3:57 PM
**To:** 'Dennis Meinyer'
**Subject:** NephoScale Investment

Hi Dennis,
Hope all is well. I just tried to call you to provide an update.

I spoke with Kevin Bluck about a week ago and asked how I should keep you and Erin updated. He recommended I put together an email update and then follow up with a call.

We did not refund the investments from Sean and Frieda because there is no doubt that cash is king and we have needed all the cash we could get to sustain us. I'm also not too concerned about the SEC getting upset with us since all of our other investors are accredited, and we have not been committing widespread abuse of the laws on soliciting investors. Also, with the recent passing of new crowdfunding laws allowing for non-accredited micro investments the regulatory landscape has changed dramatically. I think we are safe on this.

Yes, we are actively running a sales process with an investment banker to sell the company. We are getting a lot of software licensing and acquisition inquiries from large companies, and there has been on-going long term dialogue with several of them. We are also still serving Hitachi Data Systems and things are going well there.

We are also signing a deal this week to expand into China. We feel the time is right to sell the company for many reasons. It is either that or we have to go raise 10s of millions of dollars from VC's, which we do not want to do as it will dilute existing shareholders and complicate things for the company's exit and also for existing investors.

We have made it all year without taking in any investment money, we've just been existing off of revenue we are able to bring in. see the attached P/L. The good news is that we are more and more becoming a software company. You can see this new messaging on our website at www.nephoscale.com. The current challenge is that we need some runway (cash) to show potential acquirers that we are not hurting for cash, and that they cannot just wait us out to pick us up for a lower price down the road. The investment banker wants to see us raise some more money so we have a cushion that will strengthen our bargaining position with these potential acquirers. If an acquirer thinks they can wait us out, and pick us up cheaper later, they will likely try to do it.

The investment banker's strategy is to get several buyers interested in us at the same time, and for us to have enough money in the bank to last 6 to 8 months with no increases in revenue (worst case scenario). Then, the potential acquirers have to ask themselves whether they are willing to wait us out. With many interested acquirers involved, and with us having some cash on hand (runway), they usually make an offer as opposed to taking the risk that we get bought by one of their competitors in the meantime. That is the best scenario, and if this "escape velocity" is achieved, which otherwise known as an "auction environment", is created it almost always results in a successful sale of the company for a good price.

The investment banker we are most likely going to sign with is GrowthPoint Partners (www.growthpointpartners.com). We are going to decide later this week which firm we are going to choose. We are looking at 4 or 5 of them, and GrowthPoint is currently the front runner. Their managing director said we are probably worth $20M to $30M right now with the little amount of cash runway we have, whereas with a few more software deals under our belt (we are working on several of them right now), and some more cash on-hand to give us more runway, they say they could likely sell NephoScale for as much as $50M to $70M. They would get 5% of the deal so they are incentivized to get a deal done and to maximize the sale price.

There have been a lot of acquisitions in our space lately and we are more or less the last man standing. Our day will come and the investment banker is being hired to move up the timeline and maximize our eventual sale price. See the attached presentation slide deck we are using for our presentations. See slide 22 for the list of other companies that have been acquired in the cloud software space we reside in over the past 24 months. There has been a buying frenzy, to say the least.

As far as our cash needs go, we are trying to get in about $200k on the convertible note (see attached terms sheet) by the end of Oct. to give us time for some of the other things from the pipeline to fall into place. Our pipeline shows $200k coming from Hitachi, $200k from iService, and another $200k from Spirent - all in Q4.

The problem we face right now is the cash shortage we are facing between now and the middle of Nov. to the beginning of Dec. when most of that $600k is scheduled to come in. We are burning about $100k/mo. right now if we base the revenue projections solely upon what we get from recurring monthly revenue from the hosting side of the business. Revenue from software licensing, professional services, software development, and software support plans is that $600k I mentioned, which is icing on the cake and has the potential to cut down, or even eliminate, the burn rate. You can see on the attached P/L that we have found a way to bring in the needed revenue all this year so far and it has made us close to breakeven. With the added licensing and professional services revenue due still this year we could end up even being profitable for the year. Again, the current burn rate of about $100k/mo. is based only on us receiving recurring revenue from the cloud hosting part of the business, it does not include the other non-recurring revenues streams in our pipeline.

There is currently a lot of interest being shown by strategic acquirers, so it is looking like we are almost there. We just need to piece it together on the financial side to give the investment bankers time to solicit their large network of potential buyers and to execute on the sales process. This could take as little as 4 months and as long as 8 months to finalize.

We have $450k left on the current convertible note, and if someone wanted to take down the entire amount we would do it. It is expensive money due to the generous terms for the investor (we have been trying to avoid taking in more money this way for this reason), but we would do it right now because with that extra cash our runway would be long enough to put us in the driver's seat on this sales process. We know we can sell the company, the question is for how much and how soon?

Btw, investors in our notes are guaranteed 3x and 7% interest, and if we sell for more than $21M (3 x the $7M cap) then investors get to participate on the upside. Meaning, if we sold for $49M, investors would see a 6x (500%) return on principal, plus 7% interest.

Please remember that I have $4M of my money into this company, so are truly in this together, and over my dead body am I going to lose my money. Also, leasing companies and investors have preference over me in that if we sell for only $5M the leasing financing companies and investors get their money first, and our employees and me get whatever is left over. As an investor you are in a safer place than I am in when it comes to the payout pecking order.

To sum it up, the more money we have in the bank right now the more likely it is that we are going to be able to run the sales process from a position of strength. If we have money in the bank I can almost guarantee a good exit for all, if we do not have the money we need between now and Dec then things are going to get very dicey. We are well positioned to get acquired, in fact better positioning than ever before, we just need some help getting this across the finish line.

His has been a long road and we are almost there.

I'd be happy to drive up to see you again if you'd like.

Best regards,

Bruce


Bruce Templeton
CEO
NephoScale, Inc.
408-829-3949
www.nephoscale.com



---

**From:** Dennis Meinyer [mailto:dennis.meinyer@netce.com]
**Sent:** Tuesday, September 29, 2015 2:07 PM
**To:** Bruce Templeton
**Subject:** investment

Bruce, since you have refused to refund Sean's and Freda's monies, I am concerned about the investment we have made in your company. Are you actively trying to sell still? How safe is our investment money? Dennis

*Dennis R. Meinyer*
President
NetCE
1482 Stone Point Drive
Suite 100
Roseville, Ca 95661
Tele.: (800)-232-4238 ext. 111
Fax: 916-772-8585
E. president@netce.com

# EXHIBIT H



# CONVERGED INFRASTRUCTURE SOFTWARE FOR PUBLIC, PRIVATE AND HYBRID CLOUDST

**Bruce Templeton • 408.829.3949**
**bruce@nephoscale.com**
San Jose, CA, USA
www.nephoscale.com

CONFIDENTIAL

# NephoScale Overview

- **Our mission:**
  - Make clouds easier to build and upgrade
  - Make Infrastructure more programmable and automated
  - Make hardware and software easier to integrate
- **Creators and innovators of core cloud technology**
  - IaaS software stack for Public, Private, Hybrid Clouds
  - Software for converged infrastructure (hardware & software integration)
  - Auto-discovery and provisioning of data center assets
  - SDN/NFV
  - OpenStack Integration
- **Top Tier Team**
  - Engineering and product focused
  - Extensive data-center and cloud DNA



# Key Milestone to Date

## Achievements

- Developed a robust, market-proven IaaS technology stack for converged infrastructure, data center asset management, and software-defined-networking

- Leveraged, augmented, and hardened OpenStack technology

- Running NephOS software in production environments since January 2011

- Launched NephoScale public cloud w/ virtual and bare-metal provisioning

- Achieved 2015 revenue run rate of $2.5M and 2014 revenues of $2.3M

- Raised $1.25M in funding from founders and Silicon Valley Angel groups, including angle investors from VMware, ScaleArc and Rubicon Venture Capital

- Closed deals with enterprise customers such as Hitachi Data Systems, Cumulus Systems, Spirent, MixRank and ChannelMeter

- Built and fostered a loyal team of engineers that have developed amazing cloud software

*CONFIDENTIAL*

**3**

# Problems Facing Cloud Computing

- Cloud and infrastructure mgmt. is still broken in many areas, not yet delivering on expectations

| Limited Flexibility in Current Solutions | | | |
|---|---|---|---|
| Data center assets are difficult to integrate, provision, inventory and manage | Cloud software is hard to install and upgrade | Limited Converged infrastructure solutions that expose hardware and software as web enabled services | |
| **Insufficient Price and Market Disruption** | | | |
| Still dominated by expensive on-prem software or Amazon | Data center sprawl is worse than ever | Too many manual processes and disparate systems | Single reliable software stack for public, private, and hybrid clouds hard to find |



# NephoScale's Answer

## NephOS Platform: Cloud Technology Built for Flexibility





*CONFIDENTIAL*

5

# The Results

✓ A software-defined-datacenter solution that manages and auto-discovers all h/w and s/w assets

✓ Easily create and manage clouds of any type using a single IaaS software stack

✓ Comprehensive SDN/NFV solution for programmable networking and services insertion

✓ Expose h/w and s/w appliances as web-enabled, self-service, consumption-based SaaS solutions



# NephoScale Platform



| CLOUD OPERATING SYSTEM | **NEPHOS** + **OPENSTACK** | |
| --- | --- | --- |
| CLOUD SERVICES | **BILLING**<br>**TICKETING** | **MONITORING**<br>**GOVERNANCE** |
| CLOUD UNDERLAY | **INSTALLER** | **UPGRADES** |
| SOFTWARE-<br>DEFINED-<br>DATA CENTER | **BARE METAL**<br>**PROVISIONING**<br>**ASSET**<br>**MANAGEMENT** | **SOFTWARE-**<br>**DEFINED-NETWORKING**<br>**ASSET**<br>**AUTO-DISCOVERY** |

COMMODITY HARDWARE    ENTERPRISE GRADE HARDWARE

CONVERGED
NFRASTRUCTURE



NephoScale
CLOUD COMPUTING

# NephoScale Cloud Asset Management

**DATA CENTER ASSET SPRAWL**

ROUTERS        SWITCHES        SERVERS

STORAGE APPLIANCES     LOAD BALANCERS

FIREWALLS

VIRTUAL APPLIANCES

**TODAY**

**NO COMPONENT INVENTORY**

CPU     RAM     RAID CONTROLLERS  SATA     GPU

NVME FLASH      NVDIMM FLASH

COPROCESSORS (XEON PHI, ETC.)

**NEPHOS**

- Automated Asset Discovery
- Automated Asset Ingestion
- Assets Easy to View
- Organized Lists
- Tables
- Database Records



*CONFIDENTIAL*

8

# NephoScale Converged Infrastructure

## Solving the Problems with Hardware and Software Integration in the Cloud

**STORAGE**
- HDS
- EMC
- NetApp

**SERVERS**
- Supermicro
- Quanta
- HP
- Dell

*One Interface*

- Cisco
- Juniper
- Brocade
- EMC
- HDS
- NetApp
- Dell
- HP
- Supermicro
- F5 Networks
- A10 Networks
- Palo Alto Networks





*Disparate Interfaces*

**NETWORK**
- Cisco
- Juniper
- Brocade
- Intel

**OTHER**
- Firewall
- Load Balancer
- DDoS Appliance

- **Unified Web Portal**
- **Unified REST API**
- **Programmatic Control**



*CONFIDENTIAL*

9

# NephoScale – Key Product Features

- **IaaS Cloud OS** – deploy, manage and run public/private/hybrid clouds across multiple data-centers and geographies

- **Data Center Asset Management** - auto-discovery and auto-provisioning of data-center assets for compute, storage, networking and appliances

- **Virtual & Bare Metal Server Provisioning** – programmatically provision and manage any x86 based physical or virtual server

- **Software-Defined-Networking** (SDN/NFV) - automated network overlay with software based network functions and services

- **Cloud Orchestration** - build language for auto-installing complete software stacks and associated compute, network, and storage resources in a single click

*CONFIDENTIAL*

**10**

NephoScale
CLOUD COMPUTING

# NephoScale – Features Continued

| Feature | Description |
|---------|-------------|
| Integrated Billing and Ticketing | Supports custom enterprise chargeback features. Enables white label services for VARs, MSPs, and ISVs to resell, bill, and support their clients directly |
| OpenStack Integration | Swift, Designate, Keystone, and Glance completed. Neutron and Nova in development |
| Cloud Installer | Tool designed to ease the installation of the comprehensive NephOS cloud software stack. OpenStack installer in development |
| Cloud Release Manager | Tool designed to manage software releases for the NephOS cloud software stack. OpenStack release manager in development |
| Multi-cloud multi-site Manager | Tool in development designed to monitor and manage multiple clouds, each with multiple locations, through a single interface |
| Virtual Private Rack | Automated HPC and Private Cloud deployments utilizing SDN and with creation of distributed bare metal server clusters |



# NephoScale Product Roadmap



# Select Customer Deployments & Use Cases

## Select Customer Deployments & Use Cases

*CONFIDENTIAL*



# Customer: Hitachi Data Systems



**NEED:** • Hardware appliance and virtual appliance IaaS integration with HDS product lines for compute, object, file, and block storage (UCP, HCP, HNAS, VSP)

**SOLUTION:** • NephOS allowed HDS to deliver compute, network and storage that leveraged Hitachi specific hardware and software products

• implemented release manager, billing, ticketing, auto-discovery, asset management and more

*CONFIDENTIAL*

14

# Customer: Spirent Communications



**NEED:**
- Custom built, bare metal servers provisioned within minutes
- 80 Gbps throughput between the Spirent load testing appliances and each test server
- Custom images for Spirent test servers and its x86 based load testing appliances
- Auto-provisioning of servers with OpenStack Dev, then runs successive tests across all major hypervisors

**SOLUTION:**
- NephoScale was the only cloud provider that was able to deliver the requirements of their new Spirent Virtual Private Test Cloud service

NephoScale
CLOUD COMPUTING

*CONFIDENTIAL*

15

# Customer: MixRank



**NEED:**
- MixRank needed on-demand bare metal servers to allow fast horizontal scaling of their high-end analytics platform running a large Mongo database

**SOLUTION:**
- NephOS allowed for the automated provisioning of custom built, bare metal servers w/ SSD backed within minutes
- NephOS platform provided throughput and IO performance to run relational databases at peak performance; No overhead of virtualization, hyper-threading, or time slicing, or other contention issues associated with multi-tenancy
- Saved money vs. AWS



# NephoScale Service Chaining w/ SDN and NFV

**NephoScale Service Chaining**

- Traditional networks are inflexible and incapable of accommodating hardware/software controller insertion

  - manual intervention is required

  - incapable of bridging physical and virtual networks and devices

  - Cannot seamlessly adjust their orchestration engine to account for network changes.

- NephOS customers running both physical & virtual appliances and are seamlessly bridging between both types of devices in the cloud

- The NephOS orchestration system can be adjusted to modify default gateways as needed

# NephoScale Service Chaining w/ SDN and NFV

**Traditional Networks**



Manual Intervention

Unable to Route

Intern et

Physical Firewall

ADC VM

Servers

Unable to Bridge

**NephOS SDN**



Seamless Insertion

Seamless Routing to New Gateway

Intern et

Physical Firewall

ADC VM

Servers

Physical to Virtual Bridging

NephoScale
CLOUD COMPUTING

# NephoScale SDN/NFV - Use Cases

**NephoScale Service Chaining Use Cases:**

- NephOS SDN supports the insertion of physical appliances (e.g. load balancers, firewalls, IDS, DDoS, etc.) into the network.  By default, it bridges tunnels, but can also pull in VLANs from physical appliances and bridge them into the same broadcast domain.  Most SDN technologies including OpenStack Neutron do not support this "VLAN to an overlay" translation.

- NephOS SDN also supports the insertion of any virtual appliance (eg. load balancers, firewalls, ids, etc) into the network.  A benefit of its tunneled & L3 routed architecture is that any VM can take on the role of a gateway.  Hence, inbound and outbound traffic will always traverse the proper path.

- For both use cases, NephOS SDN can orchestrate the provisioning of servers to reflect the adjustments in the network (eg. default gateway).

NephoScale
CLOUD COMPUTING

# Summary

- Cloud is a massive market opportunity, with no clear winners

- Single IaaS software stack for public, private, and hybrid clouds

- Leadership and innovation within the OpenStack community

- Datacenter hardware and software asset management

- Converged infrastructure software that exposes hardware and software for web-based self-service consumption

- SDN/NFV ensures highly automated networking for cloud and converged infrastructure deployments

- NephoScale is the way



# Core Team



**BRUCE TEMPLETON**

 

### Co-founder and CEO

- Acquired and operated three hosting companies over past 10 years
- Director of Sales at Foundry



**TELEMACHUS LUU**

### Co-Founder & CTO

- Led product development for launch of GoGrid public IaaS cloud platform (launched 2008)
- Managed DC operations for Servepath's 10,000+ servers

  



**ALAN MEADOWS**

 

### Chief Architect

- Led cloud architecture design development at GoGrid
- Developed automated hosting platform for SunWave Communications



**NICK PETERSON**

### Director of Engineering

- Led cloud software engineering development at GoGrid
- Holds multiple patents in the field of Cloud Computing

  



21

# M&A Information



**22**



# M&A Sales Process – Introduction

- **Transaction**
  - Acquisition of NephoScale

- **Strategic Rationale**
  - Accelerate time to market for converged infrastructure solutions and IaaS public/private/hybrid clouds
  - Acquire a leader and innovator in the OpenStack community
  - Own an IaaS software stack and capture migration of enterprise workloads to cloud, as businesses transition to self-service web-based consumption models

- **Opportunity**
  - Significant M&A activity in this sector as IBM, HP, Oracle, Cisco, EMC, VMware and others take top independent assets to compete with Amazon, Microsoft, and Google
  - Strategic rationale and price expectations justify a tech & talent tuck-in of NephoScale

*CONFIDENTIAL*

# Landscape Aggressively Consolidating

Scarcity of assets as few viable independent options left beyond large technology companies and telcos.

| Cloud Acquisitions | |
|---|---|
| IBM | Softlayer, Platform Computing , BlueBox |
| EMC | Cloudscaling , Renasar, VirtuStream |
| Cisco | MetaCloud, Piston Computing |
| Citrix | Cloud.com, ScaleExtreme |
| HP | Eucalyptus |
| VMware | Nicira |
| Oracle | Nimbula, Nebula |
| Red Hat | eNovance, ManageIQ |
| Dell | Gale Technologies, Enstratius |
| Accenture | Solium |



24

# Transaction Timeline and Process

- August 15th - Sept. 15th: Management presentations, strategy discussions with potential buyers

- September 10th: data room available for due diligence

- September 21st: Indication of interest letters due (including price range, major deal terms and remaining diligence items needed)

- Sept 28th-Oct 2nd: Negotiate final term sheet, enter exclusivity with potential Buyer



# Back-up Slides

# Additional Information

CONFIDENTIAL

26



# Advantages of NephoScale SDN/NFV

- Leverages tunneling encapsulation to deliver network isolation on a per customer basis.  This approach supersedes traditional VLANs and allows carving out 65k broadcast domains per region

- Connects both physical ports (dedicated servers), virtual ports (cloud servers), and traditional VLANs on a single broadcast domain anywhere in the datacenter

- Uses a layer 3 and segmented topology, mitigating any risk of layer 2 broadcast loops, and allowing for subnetted racks for isolation and scalability

- Utilizes open standards like BGP to achieve fault tolerance & high availability, eliminating the need for proprietary vendor features like MLAG or CLAG

- Leverages BGP and /32 announcements, allowing the movement and targeting of any network traffic anywhere in the datacenter, all while still mimicking a traditional L2 broadcast domain from the user/tenant perspective

- Supports filtering, firewalling, packet mangling, and software-based service chaining at both the edge and the node layer (where the virtual machines reside)

NephoScale
CLOUD COMPUTING

# EXHIBIT I

# FW: NephoScale Update

**Bruce Templeton** **<bruce@nephoscale.com>**                    10/8/15

I sent this already several of our investors.

Should I also send this to Scott, or do you want to talk with him? He should know.


**From:** Bruce Templeton [mailto:bruce@nephoscale.com]
**Sent:** Thursday, October 08, 2015 11:27 AM
**To:** Erin Meinyer; dennis.meinyer@netce.com
**Subject:** NephoScale Update

Hello Erin and Dennis,
Attached is an investor letter with an update on NephoScale.

There is some good news and some bad news.

The bad news is that we just had Hitachi delay a $200k PO until December. We need to raise at least $200k to get through the rest of the year.

The good news is that there is sufficient acquisition interest from numerous companies that it is time to run an M&A process with an investment banker. We think the company can be sold quickly, and that we can return a minimum of 3x return to investors within 3 to 6 months. The investment banker has done extensive due diligence on us and they also think we can be sold quickly. We will take any reasonable offer to accelerate the process, we are not going to be greedy and we have no VCs involved on our board to force us in that direction.

I'd like to arrange a call, or a visit to your offices, to meet with you. Everyone's investment is at stake here and we are very close to getting this across the finish line to an acquisition.

Best regards,

Bruce

Bruce Templeton
CEO
NephoScale, Inc.
408-829-3949
www.nephoscale.com

# EXHIBIT J

On Wed, Oct 21, 2015 at 11:10 AM, Bruce Templeton <bruce@nephoscale.com> wrote:
Hey John,
I hear you, and I want to get your money back asap and will do whatever I can to do this. Can we talk about this before you speak with Scott?

In theory, we have until the expiration date on Dec. 23rd to finalize things, but will get your cash back asap if at all possible.

I confirmed that both you and Scott do have in your promissory notes the right to 3x return (with rights to participate above 3x in case of a sale over $21M) upon acquisition.

Bruce


**From:** John Mills [mailto:jvomills@gmail.com]
**Sent:** Wednesday, October 21, 2015 8:43 AM
**To:** Bruce Templeton
**Subject:** Re: NephoScale Note Extension

Hey, lets discuss. I want you to repay me and scott from the proceeds of the sale of the hosting business. We did a bridge to help get you to an exit, and at the time of our investment you were just about a break-even, and with hosting assets, servers, IPs, etc. I was supportive of selling the IPs because I didn't believe that you would get separate value for those in an M&A. But this is different in that you can't sell off a big chuck of your assets and not pay us back. We were pretty clear that we were not "equity" investors and that is why we took out the conversion feature from our notes.  I will also discuss this with Scott today.


Separately, can you come up to Menlo Park later today and meet with a good friend of mine? He is in town helping a company raise some money and he works for a billionaire, putting together deals, etc. I think he could probably help get you $500K +.  I gave him the deck. We are in some meetings until 10:30-11am. So probably after 2pm would work. He is flying out on the redeye tonight.

On Wed, Oct 21, 2015 at 12:52 AM, Bruce Templeton <bruce@nephoscale.com> wrote:
Hi John,

Please sign and return the attached authorization. The attached amendment is to extend the convertible note (CPN-A) out 12 months to 12/23/16. It originally had a 12/23/15 expiration date.

Do you want to forward this to Scott Powell or should I?

Thanks,

Bruce

# EXHIBIT K

---------- Forwarded message ----------
From: **Bruce Templeton** <bruce@nephoscale.com>
Date: Thu, Mar 31, 2016 at 2:50 PM
Subject: RE: NephoScale Oppty
To: Scott Powell <scott@sacjet.com>
Cc: Mills John <jvomills@gmail.com>


Hi Scott,
I will be sending out an update letter to investors soon. We should be able to pay you and
John off soon. I've got a couple of different potential avenues to get this done.

We have successfully pivoted from being merely a hosting company to being a software
company. We have already signed several potentially lucrative software deals. This is good
news about us now being a software company, as it allows us to significantly grow revenue
and with much lower expenses (meaning, as compared to hosting).

We signed a Denver based managed service provider named Tuliva that is licensing our
software starting at an annual recurring revenue run rate of $400k. Their initial public cloud
is currently being installed. Tuliva has already found new opportunities for building other
private clouds together with a large publishing company named Pearson, the financial firm
Oppenheimer Group, and a data center operator named Viawest. The Viawest deal is a
public cloud opportunity, and alone could eventually span all 35 of their datacenters and
generate over $4M/yr in revenue. Viawest is starting out with clouds in only two locations
and those clouds will be installed over the next two months.

We've also signed a managed service provider out of France, named AntementA, that will
resell our cloud software in Europe. We are installing their initial cloud platform next month.
They already have a large enterprise customer that wants to have a private cloud built for
them using our software.

The thing that makes our software so attractive to these managed service providers is that
the same software can be used to make public, private and hybrid cloud. Meaning, they can
use our software for addressing a broad range of use cases that can create several
different revenue streams around cloud services.

We have more big news coming soon. We feel the train has left the station and we expect

to double our topline revenue this year over last.

I will be in touch very soon on the pay-back.

Bruce

Bruce Templeton
CEO
NephoScale, Inc.
408-829-3949



---

**From:** Scott Powell [mailto:scott@sacjet.com]
**Sent:** Thursday, March 31, 2016 8:48 AM
**To:** Bruce Templeton
**Cc:** Mills John
**Subject:** Re: NephoScale Oppty
**Importance:** High

Good morning Bruce,

I hope all is well with you and the company.

Next month we will be crossing the two year mark on this convertible note. It is my understanding that the company has changed focus from where you where two years ago to where you are now.

Can you give me an update on how you are doing and what your plans are to pay the note?

Thanks,

Scott

On Apr 28, 2014, at 2:29 PM, Bruce Templeton <bruce@nephoscale.com> wrote:

Hi Scott,
It was great talking with you again, and thank you for taking the time to learn more about what we are working on at NephoScale.

Here is a rundown on the note:

- $7M cap (valuation).

- In the event there is a priced round of equity financing noteholders will have the option of converting to preferred stock at a $7M cap, or 20% discount, whichever is less.
- In the event of change of control (M&A) prior to maturity, or conversion, then noteholders will have the principal paid back as multiple of the $7M cap divided into the sale price of the company plus interest, or at a 3x multiple on the principal plus interest, whichever is more. In summary, if we get acquired prior to conversion then the noteholders will get the full 3x on their principal invested, as long as we sell the company for $3M or more. If we sell for more the $21M then their multiple rises above 3x.

We are at a negative cash flow run rate of about minus $30K/mo.-$50K/mo. - depending upon the month. We had it down to about $15K/mo. just about a month ago, but lost another $25K in the IP address rental revenue since then to only put us back where we were. I do think we can get back to breakeven in the next couple of months by tapping several potential sources of revenue. We do have a growing sales pipeline in place, outside of our work with HDS. The good news, if it can be considered such, is that there is little IP address revenue left to worry about losing. Over the past 12 months, we've gone from bringing in about $100k/mo. in IP address revenue to now about $10k/mo.. We have made up for the loss mostly through growing the cloud services revenue.

We are launching a new unique, and we think disruptive, SSD Virtual/SSD Dedicated w/ 10 Gbps solution at the end of this month. We call it ultra-performance Hybrid Compute. We think it will add significantly to customer traction and additional revenue over the remaining part of the year. There are several customers waiting for us to launch it so they can use it. The money to develop this new offering has already been spent on engineering and equipment, and the equipment needed for the infrastructure footprint required to launch has already been purchased. We have enough computing and storage capacity in place now to add about $50k/month in revenue in cloud services, without spending hardly a dime on equipment. We are very excited about this launch of the new Hybrid Compute solution at the end of this month.

Hitachi goes without saying, it is a big opportunity for the company in so many ways. The revenue from the HDS alone will help with grow NephoScale's revenue through added sales and marketing investment and it will accelerate the development of our intellectual property. It will also attract investors that have been on the sideline. Once this $1M note is filled out we will not be selling any more of the company at a $7M valuation. The valuation would be more like $20-30M if we did take in more money.

There is currently $436K left to fill on the note, and the sooner we can fill this out the better. We need to accelerate our efforts to grow the valuation in preparation for an acquisition or a series A round of financing. So far, we have been mostly in a defensive posture just building the platform out and making payroll. My goal is to get us to a point financially where we take a more offensive posture, and we think $200K now would do that. Once HDS has a written agreement in place with us (this should happen this week or next) we should be able to finish out the note rather quickly. The problem is that we

cannot take the chance to get too low on money and miss payroll for our engineering team. If the team splits up so they can go put food on their table, we've got trouble. There is also the morale issue, as they want more certainty in our financial situation, and my goal is to get that for them so they can stay focused on the tasks and opportunities at hand.

Whatever funds you are willing to allocate to this effort are appreciated. I'm extremely confident we are going to be successful, and that we are going to create an excellent return for our noteholders, and it will likely happen in a short period of time based upon what we built and what is happening in the market.

Best regards, Bruce

Bruce Templeton
CEO
NephoScale, Inc.
408-829-3949
www.nephoscale.com
Follow us on twitter @Nephoscale
<image002.png>

<NephoScale-Note Financing Term Sheet-04-25-14-FINAL.pdf><NephoScale-Note Purchase Agreement-12-23-13-FINAL.docx><Nephoscale-Unsecured Convertible Note_04-25-14-FINAL.docx>

## Scott Powell
President

## Sacramento Jet Center
*Safe.  Efficient. Accurate. Discreet.*
Sacramento International Airport (SMF)
Sacramento Mather Airport (MHR)
Sacramento Executive Airport (SAC)
6133 Freeport Boulevard
Sacramento, California 95822

Telephone: 916.428.8292
Fax: 916.428.3032
E-Mail: scott@sacjet.com
URL: http://www.sacjet.com

This message and any attachment are confidential and may be privileged or otherwise protected from disclosure. If you are not the intended recipient, please telephone or email the sender and delete this message and any attachment from your system. If you are not the intended recipient you must not copy this message or attachment or disclose the contents to any other person.

# EXHIBIT L

---------- Forwarded message ----------
From: **Bruce Templeton** <<u>bruce@nephoscale.com</u>>
Date: Fri, Aug 19, 2016 at 3:45 PM
Subject: NephoScale Update
To: Scott Powell <<u>scott@sacjet.com</u>>
Cc: John Mills <<u>jvomills@gmail.com</u>>


Hi Scott,
I just spoke with John on the phone. We secured some more funding, using the open
convertible note we have still open, to get us through the end of the year and even
likely to profitability. We are closing more and more software deals and the sales
pipeline is quite active with several engagements, so things are definitely looking up.

We are working with a few parties interested in funding an intuitional round of funding
over the next couple of months, and at that time we will be converting all note holders
to preferred shares at the $7M valuation. You and John are the only investors that
have communicated a desire to cash out their principal and accumulated interest. It
should be no problem to convince investors to pay you both off.

I will keep you posted.

Bruce

Bruce Templeton
CEO
NephoScale, Inc.
<u>408-829-3949</u>



# EXHIBIT M

---------- Forwarded message ----------
From: **Scott Powell** <scott@sacjet.com>
Date: Thu, Aug 25, 2016 at 8:30 AM
Subject: Re: NephoScale Update
To: Bruce Templeton <bruce@nephoscale.com>
Cc: John Mills <jvomills@gmail.com>

Hi Bruce,

I would like to cash out the principle. Due to the length of time on the bridge loan and the way the company has materially changed from from our original deal I am not interested continuing down this path, it is time to move on.

It is my intent to arrange a meeting the other investors to review our situation and start down a path that will return our capital. I will be reaching out to them next week.

While I am hopeful that you can put a plan in place in the next couple of months that will pay both John and I off but I simply can't rely on it.

I wish the best for you and hope you see tremendous success but is time for us to part ways.

Scott Powell
Sacramento Jet Center
Safe. Efficient. Accurate. Discreet.
Sent from my iPhone

On Aug 19, 2016, at 3:45 PM, Bruce Templeton <bruce@nephoscale.com> wrote:

> Hi Scott,
> I just spoke with John on the phone. We secured some more funding,
> using the open convertible note we have still open, to get us through the
> end of the year and even likely to profitability. We are closing more and
> more software deals and the sales pipeline is quite active with several
> engagements, so things are definitely looking up.

We are working with a few parties interested in funding an intuitional round of funding over the next couple of months, and at that time we will be converting all note holders to preferred shares at the $7M valuation. You and John are the only investors that have communicated a desire to cash out their principal and accumulated interest. It should be no problem to convince investors to pay you both off.

I will keep you posted.

Bruce

Bruce Templeton
CEO
NephoScale, Inc.
408-829-3949
<image004.png>

<image003.png>

# EXHIBIT N

**From:** Bruce Templeton <<u>bruce@nephoscale.com</u>>
**Date:** March 2, 2017 at 11:29:44 PM PST
**To:** 'Scott Powell' <<u>scott@sacjet.com</u>>
**Subject: RE: Note**

Scott,
The note is not in default, we have signed signatures from an aggregate majority of the investors in the convertible note authorizing the extensions. The group of investors in the note votes and the majority result applies to all investors in the note. The only way I can get you out is to get someone to assume your note, and that is because we are not allowed to buy out one investor without offering to buy everyone else out to. Everyone in the group has to be treated equally.

We are making a lot of progress and revenue from cloud software licensing is growing. I do think we are close to getting an investment round in place that will convert the notes to preferred shares. It is at that time we would be able to get you out individually without authorization from all of the other note holders in the note.

As you know this is not easy what we are trying to do and I have a lot of people

depending upon me to make this business a success. The last thing we want is to have investors onboard that do not want to be part of our mission to build a great company, but at the same time we are not going to run the company into the ground and throw away everything we've created in order to appease one or two people that want out.

According to Crunchbase the average amount of time it takes to build a company and achieve a successful exit is 7 years. John might have told you this would be a flip, but I did not invest millions of my own money and dedicate years of blood, sweat, and tears to this just to go out with my tail between my legs and not make a dime. All of our other 20+ investors are in for the long haul and believe in with what we are trying to accomplish, and we are not going to let them down either if we can at all avoid it.

Our team is committed to seeing this through and we will get you out as soon as we can do so without jeopardizing the company.

The good news is that we are closer than ever before to making this happen for you, but I cannot promise a date. I'm hoping we have some good news for you very soon.

Btw, I'm talking to the investors we have in Sacramento that John spoke to a while back about buying you and John out (assuming you notes), but unfortunately if they do decide to make an offer it will likely be for less than you originally invested. That is at least what they said in our last meeting. If you are interested I can probably arrange for them to talk with you about this.

Sincerely,

Bruce

Bruce Templeton
CEO
NephoScale, Inc.
408-829-3949



**From:** Scott Powell [mailto:scott@sacjet.com]
**Sent:** Tuesday, February 28, 2017 8:33 AM
**To:** Bruce Templeton
**Cc:** Mills John
**Subject:** Note

Bruce,

You have been in default on this note for well over a year. When we last talked in

November you stated that you had every intention of getting me paid off by the end of the year (2016). I never heard from you.

I am sick of being lied to, what do we have to do to get this cleaned up?

**Scott L. Powell**
President & CEO

**Sacramento Jet Center | SAC – SMF – MHR**
O:916.428.8292 | F:916.428.3032 | 6133 Freeport Blvd. Sacramento, CA 95822

# EXHIBIT O

---------- Forwarded message ----------
From: **Bruce Templeton** <<u>bruce@nephoscale.com</u>>
Date: Fri, Oct 9, 2015 at 2:17 PM
Subject: NephoScale Blurb
To: John Mills <<u>jvomills@gmail.com</u>>

I've used this with some success over the past few days.

With NephoScale there is an opportunity to get a 3x return with 7% interest in 6 months or less. The company has mature proven technology and is positioned well for an acquisition. After 5 years of development work the company and the team are ready for an acquisition. The company is looking to raise a bridge round of approx. $500k to complete the M&A process.

There is currently enough acquisition interest in NephoScale that several investment bankers interviewed think there is enough interest to get an auction going. After completing the interview and DD process NephoScale has chosen GrowthPoint Partners to run the sell-side M&A process. GrowthPoint has agreed to take on NephoScale as a client if approx. $500k of funding can be raised to allow for enough runway to complete the transaction.

NephoScale wants to be part of a larger organization to build more clouds at scale. The NephOS cloud software stack for building public, private, and hybrid clouds is designed for scale. NephoScale is mostly bootstrapped and is not well suited for raising successive rounds of VC funding. Meaning, not a lot of cash is going into IaaS software right now, other than to Mirantis. There is an ongoing appetite for acquiring cloud talent and technology like NephoScale has, and NephoScale is more or less the last man standing as far as privately owned OpenStack IaaS software companies go, outside of Mirantis. With Mirantis being over a $1B valuation NephoScale is much easier acquisition to justify for most companies looking for this capability. For these reasons, the time is right for an exit and both NephoScale and GrowthPoint are ready to run an M&A process and make a deal.

# EXHIBIT P

---------- Forwarded message ----------
From: **Bruce Templeton** <bruce@nephoscale.com>
Date: Tue, Sep 29, 2015 at 3:57 PM
Subject: FW: NephoScale Investment
To: John Mills <jvomills@gmail.com>

---

**From:** Bruce Templeton [mailto:bruce@nephoscale.com]
**Sent:** Tuesday, September 29, 2015 3:57 PM
**To:** 'Dennis Meinyer'
**Subject:** NephoScale Investment

Hi Dennis,

Hope all is well. I just tried to call you to provide an update.

I spoke with Kevin Bluck about a week ago and asked how I should keep you and Erin updated. He recommended I put together an email update and then follow up with a call.

We did not refund the investments from Sean and Frieda because there is no doubt that cash is king and we have needed all the cash we could get to sustain us. I'm also not too concerned about the SEC getting upset with us since all of our other investors are accredited, and we have not been committing widespread abuse of the laws on soliciting investors. Also, with the recent passing of new crowdfunding laws allowing for non-accredited micro investments the regulatory landscape has changed dramatically. I think we are safe on this.

Yes, we are actively running a sales process with an investment banker to sell the

company. We are getting a lot of software licensing and acquisition inquiries from large companies, and there has been on-going long term dialogue with several of them. We are also still serving Hitachi Data Systems and things are going well there. We are also signing a deal this week to expand into China. We feel the time is right to sell the company for many reasons. It is either that or we have to go raise 10s of millions of dollars from VC's, which we do not want to do as it will dilute existing shareholders and complicate things for the company's exit and also for existing investors.

We have made it all year without taking in any investment money, we've just been existing off of revenue we are able to bring in. see the attached P/L. The good news is that we are more and more becoming a software company. You can see this new messaging on our website at www.nephoscale.com. The current challenge is that we need some runway (cash) to show potential acquirers that we are not hurting for cash, and that they cannot just wait us out to pick us up for a lower price down the road. The investment banker wants to see us raise some more money so we have a cushion that will strengthen our bargaining position with these potential acquirers. If an acquirer thinks they can wait us out, and pick us up cheaper later, they will likely try to do it.

The investment banker's strategy is to get several buyers interested in us at the same time, and for us to have enough money in the bank to last 6 to 8 months with no increases in revenue (worst case scenario). Then, the potential acquirers have to ask themselves whether they are willing to wait us out. With many interested acquirers involved, and with us having some cash on hand (runway), they usually make an offer as opposed to taking the risk that we get bought by one of their competitors in the meantime. That is the best scenario, and if this "escape velocity" is achieved, which otherwise known as an "auction environment", is created it almost always results in a successful sale of the company for a good price.

The investment banker we are most likely going to sign with is GrowthPoint Partners (www.growthpointpartners.com). We are going to decide later this week which firm we are going to choose. We are looking at 4 or 5 of them, and GrowthPoint is currently the front runner. Their managing director said we are probably worth $20M to $30M right now with the little amount of cash runway we have, whereas with a few more software deals under our belt (we are working on several of them right now), and some more cash on-hand to give us more runway, they say they could likely sell NephoScale for as much as $50M to $70M. They would get 5% of the deal so they are incentivized to get a deal done and to maximize the sale price.

There have been a lot of acquisitions in our space lately and we are more or less the

last man standing. Our day will come and the investment banker is being hired to move up the timeline and maximize our eventual sale price. See the attached presentation slide deck we are using for our presentations. See slide 22 for the list of other companies that have been acquired in the cloud software space we reside in over the past 24 months. There has been a buying frenzy, to say the least.

As far as our cash needs go, we are trying to get in about $200k on the convertible note (see attached terms sheet) by the end of Oct. to give us time for some of the other things from the pipeline to fall into place. Our pipeline shows $200k coming from Hitachi, $200k from iService, and another $200k from Spirent - all in Q4.

The problem we face right now is the cash shortage we are facing between now and the middle of Nov. to the beginning of Dec. when most of that $600k is scheduled to come in. We are burning about $100k/mo. right now if we base the revenue projections solely upon what we get from recurring monthly revenue from the hosting side of the business. Revenue from software licensing, professional services, software development, and software support plans is that $600k I mentioned, which is icing on the cake and has the potential to cut down, or even eliminate, the burn rate. You can see on the attached P/L that we have found a way to bring in the needed revenue all this year so far and it has made us close to breakeven. With the added licensing and professional services revenue due still this year we could end up even being profitable for the year. Again, the current burn rate of about $100k/mo. is based only on us receiving recurring revenue from the cloud hosting part of the business, it does not include the other non-recurring revenues streams in our pipeline.

There is currently a lot of interest being shown by strategic acquirers, so it is looking like we are almost there. We just need to piece it together on the financial side to give the investment bankers time to solicit their large network of potential buyers and to execute on the sales process. This could take as little as 4 months and as long as 8 months to finalize.

We have $450k left on the current convertible note, and if someone wanted to take down the entire amount we would do it. It is expensive money due to the generous terms for the investor (we have been trying to avoid taking in more money this way for this reason), but we would do it right now because with that extra cash our runway would be long enough to put us in the driver's seat on this sales process. We know we can sell the company, the question is for how much and how soon?

Btw, investors in our notes are guaranteed 3x and 7% interest, and if we sell for more

than $21M (3 x the $7M cap) then investors get to participate on the upside. Meaning, if we sold for $49M, investors would see a 6x (500%) return on principal, plus 7% interest.

Please remember that I have $4M of my money into this company, so are truly in this together, and over my dead body am I going to lose my money. Also, leasing companies and investors have preference over me in that if we sell for only $5M the leasing financing companies and investors get their money first, and our employees and me get whatever is left over. As an investor you are in a safer place than I am in when it comes to the payout pecking order.

To sum it up, the more money we have in the bank right now the more likely it is that we are going to be able to run the sales process from a position of strength. If we have money in the bank I can almost guarantee a good exit for all, if we do not have the money we need between now and Dec then things are going to get very dicey. We are well positioned to get acquired, in fact better positioning than ever before, we just need some help getting this across the finish line.

His has been a long road and we are almost there.

I'd be happy to drive up to see you again if you'd like.

Best regards,

Bruce

Bruce Templeton

CEO

NephoScale, Inc.

408-829-3949

www.nephoscale.com



**From:** Dennis Meinyer [mailto:dennis.meinyer@netce.com]
**Sent:** Tuesday, September 29, 2015 2:07 PM
**To:** Bruce Templeton
**Subject:** investment


Bruce, since you have refused to refund Sean's and Freda's monies, I am concerned about the investment we have made in your company. Are you actively trying to sell still? How safe is our investment money? Dennis


*Dennis R. Meinyer*

President

NetCE

1482 Stone Point Drive

Suite 100

Roseville, Ca 95661

Tele.: (800)-232-4238 ext. 111

Fax: 916-772-8585

E. president@netce.com

# EXHIBIT Q

# Cofounders & Team

## Bruce Templeton – *CEO*



- Early team member at Foundry Networks
- Helped lead Foundry Networks sales from $10m/yr. to 400m/yr. in 4 years
- $2.5B exit

## Telemachus Luu – *CTO*



- Pioneer in cloud software product development
- Building clouds since 2005 at GoGrid and NephoScale
- Launched one of industry's first public clouds in 2008
- Previous cloud exit $50M

- Current team size is 14
- Includes 7 Developers, 4 DevOps Engineers, Bus Dev Mgr, CTO, CEO



*CONFIDENTIAL*